## WILLIAMS v. BANK OF AMERICA NAT. ASS'N.

### No. 142.

Circuit Court of Appeals, Second Circuit.

Feb. 8, 1932.

See, also, 54 F.(2d) 487.

Curtin & Glynn, of New York City (Curt H. G. Heinfelden, of New York City, of counsel), for appellant.

Leo J. Linder and Morris Permut, both of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

In January, 1926, Lack and Hansen, organized the Hanfredene Company to build two apartment houses in Brooklyn on opposite ends of a single block, which they had just bought; one later known as the Cropsey Avenue building, the other, as the Bath Avenue. They together contributed ten thousand dollars, and held all the shares. By October 18, 1926, the first building had already been finished; the walls of the second were up, but there was much left to be completed on the inside. On that day the company transferred to a predecessor of the defendant, which for convenience we shall speak of as the defendant, a second mortgage for $60,000 and a third for $20,000, both upon the Cropsey Avenue plot, from which the defendant later collected $45,000 on the second mortgage and $12,000 on the third. The transfer was to secure existing loans to the company of $57,500, and the theory of the suit is that it was insolvent and that the defendant was charged with notice of the resulting preference over other creditors. The company was adjudicated a bankrupt on February 14, 1927, and the plaintiff is its trustee. The judge held that the defendant was charged with notice of the company's affairs, which, had it been pursued, would have shown it to be insolvent. For reasons which need not be stated at the moment he abated from the recovery $12,446.40, and entered a decree for $45,053.60 with interest. Only the defendant appealed.

When the company got its deed to the two lots, there were upon it a first mortgage of $20,000 and a second of $25,000 held by the defendant. The purchase price was $57,000, of which the company completed the payment by giving a third mortgage of $12,000, whose disposition does not appear in the record. It was apparently controlled by the two promoters, and may be ignored

except as a liability of the company. These were men of some means; they did their banking with the defendant and used it as the only depositary of the company's funds; they relied upon it for their temporary financing. The money which they contributed to the company they deposited with the defendant, but drew out on February tenth for their immediate necessities. On February ninth they had secured a written promise from the United States Title & Guarantee Co. of a building loan of $150,000, but as this was available only as the apartments were built, it was essential to get enough money meanwhile to proceed. For that purpose they had asked the defendant for a loan of $40,000, and on February eighth had agreed by letter to pay any loans made to it out of the moneys received from the Title Company. In consideration of this the defendant agreed to make them advances and not to inform the Title Company of their borrowings, which might otherwise have interfered with the building loan. Thereupon on February tenth they got the loan of $40,000 which they had asked, with the proceeds of which they went on, and for which the company gave a note endorsed by them individually. The defendant does not claim that the letter of February eighth was an equitable assignment of the proceeds from the building loan when paid, but does assert that if it had filed the letter the loan would not have been made. The note for $40,000 was renewed on June ninth, and the defendant further advanced $10,000 on June fourteenth, and a like sum on July eighth, each secured by similar notes. Thus by the end of July, when the buildings were so far along that the Title Company was willing to lend $75,000, the company owed the defendant $60,000. Before paying, however, the Title Company required a discharge of the first mortgage of $20,000 and a subordination of the defendant's second mortgage of $25,000. (The purchase money mortgage of $12,000 must have been released or subordinated also, but nothing appears.) The result was that the company had only $55,000 of funds available, which was reduced by payments of one sort or another to about $48,000. Out of this it paid $40,000 to the defendant, leaving $20,000 of notes outstanding, and both lots encumbered by the building loan of $75,000 and the defendant's second mortgage of $25,000. The defendant again agreed not to advise the Title Company of the letter of February eighth and to make further advances, in consideration of the company's promise to deliver to it

as security a mortgage on the Cropsey Avenue building when it was completed.

Accordingly between the first of August and October eighteenth, the defendant continued to lend the money until by that time the total indebtedness was $57,500, unsecured except for the endorsements, the letter, and the promise just mentioned. Meanwhile the Title Company had advanced $53,000 more upon both buildings under the building loan, and the Cropsey Avenue building had been completed. Thus the situation was that the whole plot bore a single loan of $128,000; and the defendant held a second mortgage of $25,000 and endorsed notes of $57,500. On October fourteenth the Title Company "closed" a permanent mortgage of $100,000 on the Cropsey Avenue plot, allocating to it $75,000 of the building loan, and agreeing to pay $25,000 more. While it does not certainly so appear, we infer that the payment was conditional upon the release of the defendant's second mortgage, or at least its subordination. At any rate the Title Company paid the money only on the eighteenth, the day when the defendant released the plot, which thereafter bore only the Title Company's mortgage of $100,000. The Bath Avenue plot bore $53,000 of the building loan and the whole of the second mortgage. The company had already found a purchaser for the Cropsey Avenue plot at $190,000, which was to be paid by assuming the first mortgage, and giving a second mortgage of $60,000, a third of $20,000 and $10,000 in cash. The defendant's release of its second mortgage was the consideration for the company's transfer of these second and third purchase money mortgages which were to be held as security for the company's indebtedness of $57,500. As additional consideration the defendant also promised still to forbear filing the letter of February eighth, so that the Title Company should complete its loan on the Bath Avenue plot.

After the transfer the defendant continued to lend money to the company on similar though unsecured notes for the completion of the Bath Avenue plot, $12,000 of which later was paid out of the proceeds from the sale of the third mortgage which had been sold for that amount. The defendant eventually disposed of the second mortgage for $45,000, used the proceeds to pay an equal number of the notes secured and cancelled them. The rest of the secured notes had already been paid out of other funds whose provenance is not disclosed.

The judge found the value of the Cropsey

Avenue plot before it was sold to be $158,-500; that of the Bath Avenue, uncompleted as it was, $121,000; that of a note held by the company, $5,000; $284,500 in all. He found the liabilities as $336,500. After the sale of the Cropsey Avenue plot he found the value of the mortgages to be $58,500, the same as the original equity in the property, and in consequence, the total assets as $184,500, and the liabilities as $236,500; the first mortgage on the Cropsey Avenue plot being merely eliminated from both sides of the account. As the defendant had collected $57,000 upon the two mortgages transferred as security, he would have entered a decree for that amount, except for the defendant's release of the Cropsey Avenue plot from the $25,000 second mortgage. He apportioned this between the value of the two plots as he found them and assumed that the defendant had given consideration for the amount allocable to the plot released. This reduced the recovery to about $45,000.

■ The first question is of the company's solvency on October eighteenth, which depends upon the valuation of the two plots with their buildings. The valuation of the Cropsey Avenue plot at $158,500, though challenged, need not detain us; it was clearly supported by competent testimony, which was uncontradicted. Strictly the company did not own it; if it was not already sold, it was already under contract of sale, and in equity at any rate the company had only the second and third mortgages, $80,000, and $10,000 in cash. The face of these was therefore $90,000, rather than $58,500, the equity over the first mortgage of $100,000. However, second and third mortgages are not worth their face, and these in fact realized only $57,000, though the judge valued them somewhat higher. It seems closest to the truth to accept that valuation. Hence the value of the Cropsey Avenue purchase price was $68,500, that is, if we include the cash, which everybody seems to have ignored. The value placed on the Bath Avenue plot, $121,-000, was properly established. The defendant's criticism is based upon the character of the expert evidence, and that was indeed, as always, open to attack, but the objections appear to us captious, and there was no effort to meet the testimony. Especially in the case of an unfinished building, estimates are inevitably speculative. All that can be demanded is the best judgment—which is little more than an honest guess—of those who deal in such property, and are therefore more familiar with it than ordinary

men. The fact that the expert called had not seen it in its condition on October eighteenth is of small moment. It was described to him with enough detail; it was not necessary that the progress of each part should be precisely fixed. The relation between the progress of one part of the work and another is often inferable, so that when a builder knows for example that the trim and the rough 'casting are in, he may be able to reconstruct closely enough how far the rest has progressed. At any rate the witness thought he could, and the judge was entitled to take him at his word. We are indeed disposed to believe that the value he placed upon the Bath Avenue plot was if anything somewhat high.

We see no reason to disturb his determination of the liabilities either, except perhaps as to his allowance of $10,000 for unliquidated and indeterminable claims of contractors upon the Bath Avenue plot with whom the company had dealt. If this be deducted, the liabilities after the sale of the Cropsey Avenue plot were $226,000 and the assets at most not more than $194,500. As there is a deficiency even if the face of the Cropsey Avenue mortgages be taken, the company in any view was insolvent under the artificial rule laid down by the Bankruptcy Act, § 1 (15), 11 USCA § 1 (15).

■ How far the defendant is to be charged with notice of this is a more difficult question; as is usual, no direct proof is available. But we are to remember the general nature of the company's business. It was a building contractor whose affairs had to go on to completion if it was to pull through; unfinished buildings are bad assets in any market. The defendant was its only bank; the manager of the branch with which all the transactions took place had intimate knowledge of its affairs; he followed it daily in detail. It had already had a note for $4,000 protested, and while it does not appear that this was payable at the defendant's branch, it is fair to presume so, especially when all the evidence was in the defendant's own hands and it produced none. The bank account had been often substantially overdrawn in August, September and October; cheques had been dishonored, and although this was at the company's request, the reason was its financial embarrassment. All this at least proved that the company was at best extremely close-hauled for funds. If it once suspended the salvage would be no more than what the Bath Avenue plot would bring, together with the two mort-

gages transferred and the cash. It was almost certain that there were substantial claims outstanding, whose actual amount—$76,000—was not more than might have been expected. All this was a probable, perhaps inevitable, consequence of the kind of business it was conducting. The whole enterprise had been done from the outset with substantially no capital; it had really never been solvent in the sense that it could survive a stoppage and still pay in full. The eventual collapse, though delayed for nearly four months, was already foreshadowed in the company's immediate necessities. We do not see how in the face of this situation we can say that the manager, on whose appearance the judge says that he relied, was not charged with notice that he might be getting more than his share of the assets. The defendant argues that the subsequent loans are proof of his confidence in the venture. But these were secured; the promoters endorsed the notes, and they were perhaps rightly thought to be of sufficient means. That they should have been willing still further to back their company was not unnatural; they may have had motives other than financial to sustain it while they could, besides promoters' sanguine hopes of eventual success.

■■ The defense relied upon is that the defendant gave consideration for the mortgages; first, by the release of the Cropsey Avenue plot from its second mortgage, second, by forbearing to file the letter of February eighth, third, by the cancellation of at least $45,000 of the notes when they fell due. At the outset it is to be observed that the promise to secure the defendant's indebtedness was not itself a security; nor was the letter itself such. Indeed, as we have already said, the defendant does not insist upon the last. The release of the Cropsey Avenue plot from the second mortgage was of course a consideration inter partes; any detriment is enough and the defendant was not obliged to release either plot. However, the test for a preference is not the same; it is whether the effect will be to give the transferee a larger share of his debt than other creditors of his class. Section 60a (11 USCA § 96 (a). The release did not avoid this result, because the Bath Avenue plot was still ample security for the mortgage which remained a lien upon it. Its value was $121,000—the defendant says it was more—and the building loan was at the time only $53,000; there was an equity of $68,000 and the mortgage with interest was less than $27,000. It made no difference to the general creditors of the company whether it was paid in whole out of one plot, or partially out of each. Thus, though the defendant had suffered a formal detriment, it did not enrich the estate at all, and it was irrelevant to the question of a preference. We see no reason why the judge should have abated the recovery as he did, but, as the plaintiff has not appealed, he cannot challenge the decree; indeed he does not try to.

■ Possibly the release did benefit the estate in another way, which nobody has noticed. It enabled the company to sell the Cropsey Avenue plot for a consideration of $168,500, though it was worth $10,000 less. We refer to the cash payment which both sides and the judge ignored. However, we need not pursue the point; the allowance actually made was greater than could have been made, if this point is well taken. It is true that the appellee may not complain of the decree (Bolles v. Outing, 175 U. S. 262, 20 S. Ct. 94, 44 L. Ed. 156; Landram v. Jordan, 203 U. S. 56, 62, 27 S. Ct. 17, 51 L. Ed. 88; Bothwell v. U. S., 254 U. S. 231, 41 S. Ct. 74, 65 L. Ed. 238); but he may support it by anything in the record (U. S. v. American Railway Express Co., 265 U. S. 425, 435, 44 S. Ct. 560, 68 L. Ed. 1087; Langnes v. Green, 282 U. S. 531, 538, 539, 51 S. Ct. 243, 75 L. Ed. 520). Therefore, since an allowance has been made ample to cover any possible benefit from the release, we need inquire no further.

■ The defendant's forbearance as to the letter of February eighth was not a benefit either. We may assume arguendo that had it been communicated to the Title Company, that company would have refused to advance anything more, not only the final payment of $25,000 on the permanent mortgage on the Cropsey Avenue plot, but the completion payments on Bath Avenue. Even so, every dollar which it did advance was a debt, and a secured debt at that. What the general creditors got they gave back in prior claims, and if anything, it prejudiced their interest, except of course as it made more likely the company's eventual success. It would have been impossible to appraise that benefit, even if there had been no bankruptcy; but, as things turned out, the money, all of which went into the Bath Avenue plot, was lost when the mortgage upon it was foreclosed. If it were possible to treat the $10,000 cash, received for the Cropsey Avenue plot as in some way a benefit attributable to the forbearance, the same reasons forbid

its use as a deduction, as we have given when speaking of the release of that plot from the defendant's mortgage. In no view therefore can the defendant's suppression of the letter be relevant here.

Finally, the cancellation of the notes secured was immaterial. About $12,000 of these appear to have been paid from other sources than the mortgages, necessarily setting free the security pro tanto. The remainder, $45,000, were discharged by the purchase price of the $60,000 second mortgage and the notes were cancelled, the defendant by this releasing the endorsers; or we may at least assume so. The defendant argues that the situation is within Perry v. Van Norden Trust Co., 192 N. Y. 189, 84 N. E. 804; but this is an error. That case involved section fifteen of the New York Stock Corporation Law, which at that time made the transferee liable though innocent; he must have been a bona fide purchaser to escape. Under section 60b (11 USCA § 96 (b) the transferee must be in complicity with the transferor before he is liable at all; when once, as here, he is shown to be, it will not avail him to cancel the endorsements. That is his own lookout, for he knows, or should know, that his security is infirm. The lengths to which he may rely upon it are his affair, unless indeed he advances new money. Section 60 (c) 11 USCA § 96 (c). But quite aside from this, the endorsements were probably not released. The endorsers were privy to the unlawful transfer; they had designed it. They could scarcely take advantage of the bank's release made on the faith of what they had done. Kolkman v. Manufacturers' Trust Co., 27 F.(2d) 659 (C. C. A. 2); Matters v. Manufacturers' Trust Co. (C. C. A. 2) 54 F.(2d) 1010. At least if they could, it is only because the defendant was fully particeps criminis. The defendant may choose either horn of this dilemma.

Finally, it is suggested that at least the defendant should be allowed as a set-off under section 60 (c) the $12,000 lent after October eighteenth. This question is not before us. The statute expressly makes such loans available only as a set-off, and the answer should have pleaded it. Equity Rule 30 [28 USCA § 723]; Caflisch v. Humble, 251 F. 1 (C. C. A. 6). See, also, McGuire v. Gerstley, 204 U. S. 489, 27 S. Ct. 332, 51 L. Ed. 581; Deeves v. Manhattan Life Ins. Co., 195 N. Y. 324, 332, 333, 88 N. E. 395. It did not; it contained only traverses. Moreover, the point is not even intimated in the assignments of error; and even in the briefs the argument is so uncertain that we cannot be sure just what is intended. It would make no difference, if it were otherwise; we cannot undertake to decide a point which was not raised below.

Decree affirmed.