## SANTA CRUZ OIL CORPORATION v. ALLBRIGHT–NELL CO.

### No. 7195.

Circuit Court of Appeals, Seventh Circuit.

Nov. 1, 1940.

George I. Haight and Fred Gerlach, both of Chicago, Ill., for appellant.

Franklin M. Warden and F. Allan Minne, both of Chicago, Ill., for plaintiff-appellee.

Before SPARKS and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment entered November 16, 1939, in the amount of $59,038.26, plus interest in the amount of $23,615.30. The suit was instituted by complaint filed February 24, 1930, to recover damages for an alleged breach

of contract wherein the defendant, under date of March 4, 1925, acquired from the plaintiff the exclusive license to manufacture and sell products (presses and apparatus used in the extraction by pressure of oil products from meat) for which an application for a patent was pending. The interlocutory decree found the patent valid and infringed, awarded an accounting for the sums due under the contract, an injunction against infringement after the date of filing of the suit, and an accounting for such infringement.

On appeal (hereinafter referred to as Appeal No. 4995) this court (Allbright-Nell Co. v. Stanley Hiller Co., 7 Cir., 72 F. 2d 392) affirmed the finding that the contract remained in force until the suit was filed and the award of an accounting on the contract, and reversed that part of the decree which held the patent valid and infringed on the theory that its validity or infringement was not in issue.

In conformity with that part of the District Court decree affirmed by this court, the Master proceeded to a hearing on the account ordered to be stated. During such hearing the District Court sustained a ruling by the Master that the defendant could not introduce evidence to prove a mutual agreement as to the selling price at variance with that contained in the original contract. A petition for writ of mandamus was applied for by defendant in this court (hereinafter referred to as No. 5470) to require the District Court to receive such evidence. On June 15, 1935, this court ordered the District Court to instruct the Master accordingly. In re Allbright-Nell Co., 7 Cir., 78 F.2d 430.

The proceedings before the Master were resumed, and the correspondence between the parties, which was in the record before this court on Appeal No. 4995 concerning the selling price, was supplemented by additional correspondence and oral testimony.

The nature of the agreement in suit is described in the former opinions referred to and need not be repeated.

This controversy, however, revolves largely around Paragraphs 4 and 8, which we set forth in a footnote.[1]

The Master filed a report June 21, 1937, and found that "the parties, subsequent to the execution of the written contract, entered into a mutual agreement, by which they agreed to sell the Hiller press at approximately the same price as the Anderson press of similar type, size, and capacity." Sixty-eight presses were sold. The gross income received by the defendant from the sale of said presses, its manufacturing cost, plaintiff's one-half share of profit with interest thereon, together with certain other minor adjustments, are shown in the Master's summary.[2]

Plaintiff filed exceptions to the Master's report, fixing the damages on the basis of the actual selling prices and for the allowance to defendant of a credit of $1000

---

[1] "(4) It is understood and agreed that the selling price for all such machinery, equipment and apparatus shall be fixed by mutual agreement between the parties hereto, but in the event of any such agreement not being reached, such sale price shall be not less than twice the actual cost of such articles as the same may be shown by such books and records of Second Party; and the fixing of such prices, if by agreement, shall be in writing and may be changed from time to time in a similar manner."

"(8) Second Party shall pay to First Party, when and as received by said Second Party on each sale, one-half of the actual net selling price thereof, after first deducting and retaining the actual net cost to it of such article; that is to say, that from the first proceeds from the sale of each article manufactured by Second Party hereunder, it shall first deduct and retain the actual net cost of all labor and material, including overhead properly chargeable to the manufacturing cost of each article, but exclusive of any advertising or sales cost, and all excess of such selling price therefrom shall be divided equally between the parties hereto, collected by Second Party, and one-half thereof paid to First Party when as the same is received, including interest on any deferred or installment payments."

[2] 
| | |
|---|---|
| Gross Income on the Hiller Press | $173,917.72 |
| Extra Income on the Hiller Press | 1,282.05 |
| Total Income | 175,199.77 |
| Total Costs Allowed | 138,485.65 |
| Profit | 36,714.12 |
| Hiller's one-half share of profit | 18,357.06 |
| Interest due on Hiller's share at 5% from 2/24/30 until 2/24/37, excluding one year of litigation | 5,507.12 |
| Interest due Hiller on deferred payments | 500.00 |
| Total due Hiller on presses as of February 24, 1937 | 24,364.18 |
| Net Total due Hiller as of February 24, 1937, after deducting $1,000 for Hiller loan | 23,364.18 |

advanced to the plaintiff for the completion of a press which it had contracted to furnish at the time of entering into the license agreement. Defendant filed exceptions to the report because it included profits on an auxiliary driving mechanism sold with the presses, interest on unliquidated damages, the disallowance of credits for goods which defendant claimed it delivered to plaintiff and certain other allowances. It will be observed that the Master's statement of account is predicated upon the theory that the parties, by mutual agreement entered into subsequent to the execution of the license agreement, determined a price at which the presses were to be sold and that, therefore, the language of Paragraph 4, "such sale price shall be not less than twice the actual cost of such articles * * *" was not to be applied.

The District Court, in response to plaintiff's exceptions to the report, reversed the Master's finding that the selling price was agreed upon by the parties and, in effect, directed the Master to state the account in accordance with the court's holding that the selling price had not been modified or changed. The effect of the court's holding in this respect, as construed by the Master on the order of re-reference, was to order the Master to compute the damages on the double-cost basis. The court affirmed the allowance by the Master to defendant of the credit for $1,000, but apparently made no ruling upon other exceptions to the report.

Subsequently, the Master filed a second report similar in most respects to his first, except that in compliance with the court's order on re-reference, plaintiff's damages were computed and reported upon a selling price of double the cost. Under this theory, defendant's gross revenue was $253,834.65, factory cost $128,418.87, leaving a net profit of $125,415.78. Certain other minor adjustments were made in the account, reducing the amount due plaintiff to $59.038.26, which, plus interest, totals $81,653.56, the amount awarded plaintiff. This report was approved by the court and judgment entered from which this appeal is taken.

It is thus apparent that the question of prime importance on this appeal is whether plaintiff was entitled to a judgment in conformity with the Master's first, or second report. This involves the propriety of the action of the District Court in sustaining exceptions to the first report. In other words, was the court justified in its refusal to accept findings of fact as made by a Master? Rule 53(e), Paragraph (2), of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." The language thus employed leaves no room for argument that the District Court is bound by such findings "unless clearly erroneous." The rule binds the District Court to accept findings of a Master just as Rule 52(a) binds this court to accept findings of a District Court. In fact, the language of the two rules is quite similar. The latter rule provides: "Findings of fact shall not be set aside unless clearly erroneous." These rules promulgate no new principle of procedure, as such principle has long been recognized by the courts. It was aptly stated in Adamson v. Gilliland, 242 U.S. 350, on page 353, 37 S.Ct. 169, 170, 61 L.Ed. 356, where the court said: "* * * the case is preeminently one for the application of the practical rule that so far as the finding of the master or judge who saw the witnesses 'depends upon conflicting testimony or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable.' * * *" Other cases where similar rules and statutes have been thus construed are: Davis v. Schwartz, 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289; In re Mendota Building Co., 7 Cir., 92 F.2d 644, and Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275.

We can recall to mind no case where this rule may be more appropriately applied than in the instant situation. Here we have a difficult and involved proceeding in accounting. In compliance with the Master's subpoena, an account was stated by the defendant. Much labor and thought was given to the matter by an experienced Master, as is amply disclosed by a study of the first report rendered by him. He heard, saw and observed the witnesses and was in a better position to judge of their credibility and the weight to be given their testimony than either the District Court or this court, neither of which has had such an opportunity. To set aside his findings "unless clearly erroneous" is not only contrary to the rule quoted and the accepted practice, but amounts to a trial de novo by the reviewing court with no

assurance that any better or more accurate results could be achieved.

That brings us to the question as to whether the findings of the Master were "clearly erroneous." A careful examination of the oral testimony, in addition to the mass of documentary evidence, convinces us not only that the findings of the Master were not "clearly erroneous" but that they were well grounded. It would prolong this opinion unduly to relate in detail the material testimony in this respect, but we will summarize what appears to us to furnish abundant support to the findings as made by the Master.

As stated, the license agreement in question was entered into March 4, 1925. At that time, as well as prior and subsequent thereto, defendant was engaged in furnishing substantially complete rendering equipment for meat packers, an essential part of which was what is designated as the screw press. Prior to the date of the license agreement, the press sold by defendant was what is known as the Anderson Screw Press, purchased by the defendant from the Anderson Press Company. There was nothing in the agreement which precluded the defendant from the use of the Anderson Press and, as a matter of fact, it used such press in some of its sales subsequent to the execution of the license agreement. There is some controversy as to who initiated the negotiations which culminated in the license agreement, as well as the representations made by the plaintiff with reference to the character of work which plaintiff's press was capable of performing. We do not regard any controversy in this respect as material to the question now under consideration. Regardless of what happened prior to the execution of the agreement, the question remains as to whether the selling price as fixed by the agreement was changed by mutual action of the parties as found by the Master. A study of the correspondence which passed between the parties is, we think, convincing that the parties modified the provision of the agreement that the press was to be sold on the so-called double-cost basis. July 11, 1925, plaintiff wrote defendant as follows: "* * * Also, you have never furnished us with any data as to what the price will be on this equipment. (press) We wish you would furnish us with the sales price, together with full information regarding commission." It will be noted that this letter was written about four months after the license agreement had been entered into. July 28, 1925, defendant wrote in reply: "In regard to the selling price and commission on the Hiller Press, the writer is not entirely familiar with just what we are doing on this, but he believes that up to the present time we have been maintaining our selling price the same as for the Anderson Expeller."

October 17, 1925, plaintiff wrote as follows: "As soon as possible, please give us figures on the cost and selling prices on the Press as we are interested, as you know, in handling this for the fish business and we have been awaiting the time when the machine would be successful and when you would be able to furnish us proper costs so we can figure on our work accordingly."

October 22, 1925, defendant replied: "As far as sales price goes, we have adopted the policy of making the price the same as Anderson's for the time being.

"Of course, the first press was very expensive on account of changes and the experimental work we had to do. These next two presses, however, are being built without changes, and we hope to have a good line on costs."

December 4, 1925, defendant wrote: "Our contract calls for us to charge double our cost in order to make sales price. Of course you know that is impossible, but I wish to refer to it so that it does not miss your attention, but please let me know that you are satisfied with the prices as made at present. These prices are the same as Anderson's, and that is all we can expect to get until we have got a record of service and know to what extent our press is superior to the Anderson."

On the same date defendant wrote plaintiff:

"Presume you know that Anderson's prices are as follows:

"Anderson Expeller, belt drive.. $2410.00
"Arranged for Motor Drive but
　　without motor ............. 2610.00"

December 14, 1925, plaintiff wrote: "Besides this, some day we hope to have some commissions coming to us."

February 28, 1926, defendant reported to plaintiff concerning the sale of three presses, in which report was itemized the cost of material as to each press, and disclosed a selling price of $2,410.

Plaintiff acknowledged receipt of this report and replied that he would come to Chicago, which he did, and a conference was had on March 30, 1926, attended by plaintiff and three of defendant's representatives. What was said at this conference is a matter of dispute. Defendant's witnesses testified before the Master to the effect that plaintiff agreed to a selling price the same as that of Anderson's, while such an agreement is disputed by plaintiff. July 21, 1926, after this conference, plaintiff wrote: "* * * We feel that we can make a press of the same capacity as Anderson's that will sell a little cheaper. * * * In turn, we must sell at the same price, owing to the fact that we only make one machine. Thus we feel that we will give Anderson a great deal more of a rub than he ever is dreaming of."

August 27, 1926, defendant again reported to plaintiff concerning the first eight presses sold, showing the selling price of each to be $2,410. December 1, 1926, defendant reported the sale of eighteen presses, with the same selling price as Anderson's. Concerning this report, plaintiff, December 24, 1926, wrote:

"We are not going to comment on this at the present time as we are not in possession of enough facts regarding the cost of this equipment. We note, however, that the costs have not decreased at all—in fact we might say increased.

"We had hoped by this time that you would be in position to materially cut these costs. However, we will leave this matter totally in your hands for the present at least to see how this matter is going to work out."

March 4, 1927, plaintiff forwarded to defendant photographs of a press which he had built, and the manufacture of which he was contemplating, with a view of having defendant sell them. In this letter, plaintiff stated: "Can you sell these presses for single Laab's installations at $1875.-00 each. Our cost is approximately $1,-200.00, and we will split fifty-fifty same as all other arrangements with you."

Again, on May 28, 1928, defendant reported the sale of forty-eight presses at a selling price substantially the same as Anderson's. A number of other exhibits, mostly letters passing between the parties, are in evidence, and at no time did plaintiff object to the price at which the press was being sold, and we think that the ex-hibits clearly disclose an acquiescence on his part. His chief complaint was the high cost of manufacture. As aptly pointed out by the Master: "* * * The most reasonable, in fact almost unavoidable, inference to be drawn from the correspondence of the parties is that the controversy between them revolved around manufacturing costs, rather than selling price. From the cost controversy itself, there is a strong implication that defendant was not to account for twice the factory cost; for if that were Hiller's understanding, he would not have objected to the high cost, because his returns would increase in a direct ratio with an increase in costs. On the other hand, if Hiller did not regard the defendant obligated to pay twice the cost his returns would decrease with increase of cost; hence, his objection to the costs reflects his realization that there was an agreed price. * * *"

It appears to be the contention of the plaintiff that the question as to whether the contract selling price was changed by mutual agreement of the parties has heretofore been decided by this court, and quotes the following paragraph from our opinion in Appeal No. 4995. Allbright-Nell Co. v. Stanley Hiller Co., 7 Cir., 72 F.2d 392, 394: "After the contract was signed the parties communicated by letter relative to the manufacture and marketing of the presses. There was some reference in the correspondence to the sale price of the presses, but we are satisfied that the correspondence never ripened into an agreement which changed the original contract."

In Appeal No. 5470, however (In re Allbright-Nell Co., 7 Cir., 78 F.2d 430, 431), we disclaimed the language used in the former opinion, and said: "* * * Hence, whether the correspondence ever ripened into an agreement which changed the original contract was not before us. * * *"

It may also be pointed out that there was introduced in evidence before the Master correspondence in addition to that contained in the records formerly presented to this court.

Plaintiff also contends that the modification of the original contract as to the fixing of a selling price by an oral agreement was in contravention of the Statute of Frauds. We think this contention is not sound for two reasons: First, the contention was waived by a failure of plaintiff to except to the Master's report

on the grounds now alleged. It is true, no doubt, as stated by plaintiff, that the question was presented in its written argument to the District Court. That argument, however, is no part of the record here and, so far as appears from the "memorandum on exceptions" entered by the District Court, that question was not considered. The exceptions to the Master's report were sustained according to this memorandum for the reason that the court did not believe the oral testimony of the witnesses, and upon the reasoning that it was unbelievable that business men would thus change the selling price without reducing the agreement to writing. Second, and a better reason why plaintiff's contention in this respect must be denied is that the Master's finding was not based upon oral testimony alone, but such testimony was considered in connection with the letters and other written evidence bearing upon the question. We think the written evidence alone is sufficient to sustain the Master's finding, and if so, it becomes unnecessary to determine to what extent, if any, the original contract could have been modified by parol evidence.

It is therefore our conclusion that the findings of the Master in this respect are supported by the record and that the court erred in sustaining plaintiff's exceptions thereto.

Plaintiff urgently insists that even though there was an agreement to sell at the Anderson's price that the record fails to disclose what that price was, as well as the price at which defendant actually sold the press to its customers. In discussing this question, the Master said: "The difficulties in ascertaining defendant's selling price are due primarily not to deficiencies in the defendant's accounting methods, but to the defendants practice in making sales. The transactions, almost without exception, involve blanket prices for a large amount of equipment; that is, if ten articles were sold, the price of each article was not specified in the contract, but a price was stated for the entire order. * * *"

The Master found, however, and we think properly so, that the Anderson Press, prior to May 28, 1928, was listed at $2,400 and the motor mount and chain drive at $200. It will be remembered that $2,410 was the price reported to plaintiff by the defendant as that of the Anderson Press. The Master, in computing the price of the presses sold by defendant prior to May 28, 1928, with some slight exceptions not now important, charged the defendant $2,610 per press. Defendant excepted to the Master's report as to $200 of this charge. This amount represented the price of a silent chain transmission which defendant argues was not covered by plaintiff's patent, was open to the public, and that the defendant had a right to furnish it with any presses sold, whether plaintiff's or otherwise. We do not think defendant's position is tenable in this respect. The press driver was a necessary part of the press. It was delivered in connection with plaintiff's press so that the same was complete and ready to be connected with the motor. It is hardly conceivable that the parties, when they agreed to a modification of the selling price as fixed in the original agreement, contemplated that that price should be Anderson's price merely for the naked press without any means of operation. There is no question involved as to whether the press drive is covered by plaintiff's patent. Assuming it was not, it was attached to, made and sold as a part of, the apparatus covered by the license agreement, and we are of the opinion that defendant was chargeable with such price and that the Master was correct in so determining.

May 28, 1928, defendant gave notice to plaintiff that the press had been redesigned and that subsequent presses would not embody any features of plaintiff's patent rights, and that it would not regard the future presses as coming within the contract. After the giving of this notice it appears that the presses were sold for the sum of $2,860, and this was the amount generally charged to defendant by the Master. It appears that about the time this notice was given, the price of the Anderson press was increased to this amount so that defendant's selling price remained substantially on a level with that of Anderson's. Defendant, however, contends that it should not be required to account for any sales made after the giving of the notice referred to for the reason that the press, as manufactured and sold, does not come within the terms of plaintiff's patent, and defendant devotes considerable argument in an effort to demonstrate that such is the case. We do not regard this argument as pertinent. In the first place we think it has been decided adversely to defendant's contention in Appeal No. 4995 (Allbright-Nell Co. v. Stan-

ley Hiller Co., 7 Cir., 72 F.2d 392, 393). In the second place, as already pointed out, this is not a suit for infringement or an accounting for infringement, but upon a contract. Paragraph 1 of the contract in this regard, provides: "Nothing herein contained shall be construed as vesting in Second Party any title to any of said patents and that all improvements, and changes in designs, in the apparatus, machinery or equipment herein dealt with, whether patented or not, shall belong to First Party."

We think the Master correctly concluded that defendant should account for all presses sold prior to the institution of suit.

 Defendant also contends that it was entitled to a credit for certain items the total amount of which is $3648.97. The Master regarded these items as a claim for set-off and refused to allow them for the reason that the defendant had failed to file a counterclaim in compliance with Federal Equity Rule 30, 28 U.S.C.A. following section 723. We approve the Master's action in this respect. See Williams v. Bank of America Nat'l Ass'n, 2 Cir., 55 F.2d 884, 889. In this connection, the Master allowed defendant credit for a loan in the sum of $1000 made to plaintiff and expended by it in connection with the manufacture of one of its presses prior to the time the manufacture of such presses had been taken over by the defendant. We think this item was properly allowed.

 The Master, in his first report, as well as in the second, allowed plaintiff interest on the amount found owing it. In the first report the interest was calculated at 5% from February 24, 1930, the date the complaint was filed, but omitted one year for a portion of the time spent in litigation. Defendant contends that it is not liable for interest until plaintiff's damages are liquidated. We do not think it is necessary to review the numerous authorities cited by defendant in support of its contention. They have to do largely with accountings for patent infringement and suits for the recovery of unliquidated damages. This is a suit on a written contract, and we think is governed by Section 2, Chapter 74 of the Revised Statutes of the State of Illinois. Under numerous holdings of this court, we think plaintiff clearly was entitled to interest as allowed by the Master. Morrison v. Rieman, 7 Cir., 261 F. 355, 356; Sanford Coal Co. v. Wisconsin Bridge & Iron Co., 7 Cir., 293 F. 735, 736;

McGuire-Cummings Mfg. Co. v. United States Alloy Steel Corp., 7 Cir., 292 F. 832, 837.

We have carefully read the numerous briefs and reply briefs filed by the respective parties and are willing to concede that there are a number of questions argued, especially by the plaintiff with apparent plausibility, but which a careful study discloses are without basis. It would serve no useful purpose for us to prolong this opinion in an effort to discuss and dispose of them. We think we have decided the essential questions in controversy. We are convinced that the Master's first report came as near doing justice between the parties as could reasonably be hoped for considering the complicated and confused situation with which he was presented.

We conclude that the District Court erred in sustaining plaintiff's exceptions to that report. Therefore the judgment appealed from is reversed with directions to vacate the court's order of re-reference and the Master's second report, to overrule all exceptions to the Master's first report and to enter judgment in favor of the plaintiff in conformity with said report. The costs of this appeal shall be shared equally by the parties thereto.