**In the Matter of the TRIMBLE COMPANY, a Corporation.**

**William J. McMinn, Samuel A. Robinson, Joseph A. Warren, Jr., and R. J. Mitchell, Creditors, Appellants.**

**No. 14787.**

United States Court of Appeals Third Circuit.

Argued June 4, 1964.

Decided Dec. 29, 1964.

R. J. Cleary, Pittsburgh, Pa., for appellants.

Glenn B. Reed, Pittsburgh, Pa. (K. Sidney Neuman, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and HASTIE and GANEY, Circuit Judges.

GANEY, Circuit Judge.

On June 4, 1962, four individuals filed a creditors' petition in bankruptcy against The Trimble Company ("Company"), a corporation organized and existing under the laws of Pennsylvania, and having its principal place of business in Pittsburgh, Pa.

The petition alleges that the four individuals were creditors of the Company at the time of the filing of the petition, having provable claims against it, fixed as to liability and liquidated in amount, totaling more than $500. The amount claimed to be owing them is $145,062.33, plus interest at 5% a year,[1] evidenced by eight promissory notes. The asserted ground for the petition is the second act of bankruptcy, to wit: the Company, while insolvent, did, within four months preceding the filing of the petition, make preferential transfers to persons and companies named in the petition.

The Company's answer to the petition admits having executed the promissory notes and receiving notices of default and that such notes have not been paid. In defense the Company claims that payment by it on or after March 31, 1961, would be illegal under the provisions of the Pennsylvania Business Corporation Law of May 5, 1933, P.L. 364, as amended in 1957, particularly §§ 701–709 thereof, 15 P.S. §§ 2852–1 et seq., 2852–701 to 2852–709, because its capital would be impaired by payment of any part of the notes since it had "no unrestricted or unreserved earned or capital surplus legally available" for such payment. As an additional defense, it denies having committed the second act of bankruptcy.[2]

The petitioners and the Company entered into a stipulation of fact; they also presented testimony before the court sitting without a jury. From the stipulation we obtain the following pertinent information:

On March 12, 1958, in settlement of a dispute between the Company and the petitioners who were then shareholders of the Company, they entered into an agreement effective March 31, 1958. The Company agreed to purchase from the petitioners a total of 8,100 shares of its own stock for $433,500 or about $53.52 per share.[3] The Company was to pay 30 percent of the purchase price in cash and the balance of $303,345 in annual installments to the four petitioners as follows: To each of two of the petitioners owning 2,200 shares each, five payments of $16,478; to the third, possessing 2,200 shares, three payments of $27,463.33; and to the fourth, holding 1,500 shares, three payments of $18,725.

---

1. As of the date of filing of the petition, this amount totaled $160,771.88.

2. The Trimble Company demanded a jury trial. However this demand was later withdrawn and the matter was placed on the non-jury trial list.

3. The shares did not contain any redemption provisions.

On April 7, 1958, the petitioners surrendered their 8,100 shares to the Company and received in exchange $130,005 in cash and sixteen promissory notes as evidence of the amounts to become due in the years to follow. These notes bore interest at 5 percent per year, and contained a notation that in the event of default in the payment of interest or principal on any one of such notes continuing for 30 days or more after written notice thereof, all such notes shall become due and payable. At the time of the transfer, the Company's unrestricted and unreserved earned surplus was over $900,000 or more than enough to pay the full purchase price of $433,500 for the 8,100 shares. Immediately upon the acquisition of such shares, the Company made entries in its books of account restricting the amount of its earned, capital surplus and capital stock by the amount of the entire consideration being paid for the shares, and noted that amount as a liability of the Company. The transferred shares were not retired or resold by the Company, but were retained as treasury stock, bringing the total of such stock to 10,300 shares and left outstanding 9,700 shares all owned by members of the Trimble family. Thereafter, the Company carried the amount of the notes upon its books as a debt owed to the petitioners.

The first two installments totaling $158,288 were paid on schedule, but the Company did not pay on the third installment allegedly due March 31, 1961. On that date its books reflected a deficit of $11,043.65. The required demand for payment was refused by the Company, and the petition followed. The Company has paid nothing on the remaining eight notes, and its net worth, as of the filing of the petition, showed a deficit of $114,406.67 on the books.

In the order, from which petitioners have appealed, the district court notes, in dismissing the creditors' petition without prejudice, the following:

"[I]t appearing that at the time when certain subsequent installments of said notes became payable payment thereof would have rendered said corporation insolvent; and the Court being of the opinion that it is against public policy under Pennsylvania law for debts arising out of purchase of its own stock by a corporation to impair the capital which should be available for bona fide creditors of the corporation, and that petitioners' debts arising out of stock purchase were unenforceable at the expense of bona fide creditors of the corporation, and contingent, and hence do not give petitioners standing as petitioning creditors to institute these proceedings. * * *"

### I.

The petitioners contend that the district court erred in dismissing their petition because they are creditors having claims within the meaning of § 59, sub. b of the Bankruptcy Act, as amended effective October 7, 1952, 66 Stat. 425. This section, prior to the September 25, 1962, amendment (76 Stat. 570, 11 U.S.C.A. § 95 sub. b), read as follows:

"b. Three or more creditors who have provable claims liquidated as to amount and not contingent as to liability against any person which amount in the aggregate in excess of * * * $500 or over * * * may file a petition to have him adjudged a bankrupt."

As of April 7, 1958, the Company had the right to purchase the 8,100 shares of its own stock for the price it agreed to pay for them, and to issue its promissory notes for the balance due on the purchase price.[4] When the four individuals

4. Section 701, subd. A of the Pennsylvania Business Corporation Law of 1933, as it was in effect on March 31, 1958, Act July 11, 1957, P.L. 737–738 (1957), provided as follows:

"Section 701. Right of corporation to acquire its own shares. A. Unless its articles otherwise provide, a business corporation shall have the right to purchase or otherwise acquire, and to hold

transferred their shares to the Company on that date· and accepted cash and notes in return, they ceased to be stockholders of the Company and became creditors of the Company. See Columbian Bank's Estate, 147 Pa. 422, 436, 23 A. 625, 626, 628 (1892). However, the Company contends that by reason of its financial condition on March 31, 1962, and continuing thereafter, § 701, subds. B & F of the Pennsylvania Business Corporation Law of 1933, as amended, rendered unenforceable the eight outstanding notes held by the petitioners, and, therefore, they did not qualify as creditors within the meaning of the 1952 amendment of § 59, sub. b of the Act when the petition was filed. The petitioners disagree. They argue that the transfer of stock was lawful when made, and the Pennsylvania Law did not render it unenforceable as to the unpaid amounts by reason of the changed financial position of the Company.

[1] The subsections of § 701 of the Pennsylvania Business Corporation Law of 1933, as amended in 1957, setting forth the conditions under which a corporation may acquire its own shares, did not expressly prohibit the corporation from paying for them in a situation like the one before us.[5] There are no authoritative Pennsylvania cases in point either under § 302(7 & 8) of the 1933 Law, or under § 701 of that Law as amended in 1957 and 1959.[6] Fortunately, there are a number of cases interpreting statutes of other states under fact situations similar to those in our case. Perhaps the leading case is In re Fechheimer Fishel Co., 212 F. 357 (2 Cir. 1914), interpreting a New York penal statute. There, a stockholder transferred his stock and accompanying bond to the corporation in exchange for the cor-

and own shares which are not subject to redemption."
Section 302(8) of the same Law, P.L. 721 (1957), provided in part:
" * * * [E]very business corporation shall have power:
    *     *     *     *     *
"(8) To borrow money for any and all purposes for which it is organized, and to issue its promissory notes * * * for * * * property, including shares of the corporation properly acquirable by it under this act, actually received * * *."

5. These subsections provided in part as follows:
"Section 701. Right of corporation to acquire its own shares
    *     *     *     *     *
"B. All purchases by a business corporation of its own shares which are not subject to redemption however, whether direct or indirect, shall be subject to the limitations contained in subsection F hereof, and shall not be made except:
  "(1) To the extent of its unrestricted and unreserved earned surplus, or
  "(2) If it has no such earned surplus, to the extent of its unrestricted capital surplus * * *, or
  "(3) If it has no such earned surplus, to the extent of the aggregate of its unrestricted capital surplus, and, if it has no such capital surplus, to the extent of its unrestricted stated capital

but only if such purchase shall be for the purpose of eliminating fractional shares, collecting or compromising indebtedness to the corporation, or paying dissenting shareholders entitled to payment for their shares under the provisions of this act.
    *     *     *     *     *
"F. (1) No purchase of its shares shall be made at a time when a business corporation is insolvent or when such purchase would render the corporation insolvent.
    *     *     *     *     *
  "(3) To the extent that earned surplus or capital surplus or stated capital is used as the measure of a business corporation's right to purchase its own shares, such surplus and stated capital shall be restricted so long as such shares are held as treasury shares.
    *     *     * "

6. In Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940), the Supreme Court said at page 177 of its opinion, 61 S.Ct. at page 178: "The highest state court is the final authority on state law (cited cases omitted), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State."

poration's note. Although the note was given in good faith at a time when the corporation was solvent, the Court of Appeals, in ruling that the note was unenforceable as against other creditors of the corporation if the corporation was insolvent at the time of maturity, said at page 366:

"[T]he corporation * * * in effect promised to pay * * * out of surplus profits and if payment could be made without prejudice to creditors. To be sure the note did not so state on its face, but that was a condition which the law attached to it and which was binding on both [parties]. The fact that the corporation had a surplus when the note was given is not decisive of the case if it was insolvent when the time for payment arrived."

The Court reasoned that if a stockholder accepts notes in payment for his stock "he sells at his peril and assumes the risk of the consummation of the transaction without encroachment upon the funds which belong to the corporation in trust for the payment of its creditors." (p. 363). Also see In re Dawson Brothers Construction Co., 218 F.Supp. 411 (N.D.N.Y., 1963).

And in Mountain State Steel Foundries, Inc. v. C. I. R., 284 F.2d 737 (C.A. 4, 1960), where a West Virginia statute governed, the Court said at page 742:

" * * * When a corporation purchases a portion of its outstanding stock with an agreement to pay for it at a subsequent time, it may not perform its promise if the use of its funds in performance will impair its capital. This is true though earlier performance at the time of consummation of the executory agreement would have occasioned no impairment of the capital.

"The promise, therefore, is conditional. The corporation's promise is to pay provided at the time of payment it has sufficient surplus that disbursement of the funds will occasion no impairment of capital. In

effect, the statute is read into the agreement." [Footnotes omitted.]

The rationale of the Fechheimer Fishel Co. case has been followed by a number of Federal courts. See Matthews Bros. v. Pullen, 268 F. 827 (1 Cir. 1920); In re O'Gara & Maguire, Inc., 259 F. 935 (N.J., 1919—New Jersey Statute); In re Vulcan Soot Cleaner Co., 11 F.Supp. 388 (W.D.Pa., 1935—Delaware Statute); Baxter v. Lancer Industries, Inc., 213 F. Supp. 92 (E.D.N.Y., 1963—Florida Statute); In re Mathews Construction Co., 120 F.Supp. 818 (D.C.Cal., 1954—California Statute).

The Courts of Pennsylvania subscribe to the proposition that the capital stock of a corporation is considered to be a trust fund for the benefit of its creditors. Columbian Bank's Estate, supra, 147 Pa. at 436, 23 A. 625, 626, 628; Tepel v. Coleman, 229 F. 300, 305 (M.D.Pa.1914), aff'd 230 F. 63 (C.A.3, 1916); Beneficial Corp. v. Reading & S. W. St. Ry. Co., 91 F.Supp. 803 (E.D.Pa. 1950), aff'd per curiam 185 F.2d 238 (C.A.3, 1950). Also see Warren v. Queen & Co., 240 Pa. 154, 87 A. 595 (1913); Wolf v. Excelsior Automatic Scale & Supply Co., Inc., 270 Pa. 547, 549, 113 A. 569 (1921). We think a Pennsylvania Court of Statewide jurisdiction would hold that payment on the eight notes was unenforceable on and after March 31, 1962, until such time as the assets of the Company were such that payment would not violate the law.

Petitioners' alternative argument rests upon § 303 of the Pennsylvania Business Corporation Law, 15 P.S. § 2852-303. This statute deals with the defense of *ultra vires*. It is their argument that since this statute would bar the Company from asserting the defense of unenforceability in a suit on the notes, such defense should also be barred here. In Downing v. Erie City School District et al., 360 Pa. 29, 61 A.2d 133 (1948), the Court held that an insurance company was estopped from asserting a defense of *ultra vires* in an action upon a policy of insurance because the plea fell under the

rule that a corporation which has received and retained the benefits and advantages of a contract should not be allowed to escape its obligations "especially if the contract does not contravene any statute or public policy." (p. 40, 61 A.2d p. 138). The Supreme Court of Pennsylvania, in holding that a corporation may not honor a promise to redeem its own stock if at the time redemption is due, the corporation does not possess sufficient funds to redeem them without doing injustice to the rights of creditors and other stockholders, said in Warren v. Queen & Co., 240 Pa. 154, at p. 160, 87 A. 595, at p. 597 (1913): "Aside from the Act of 1873, it would be against public policy to permit a preferred stockholder to assert his claim as such against the funds of a corporation in preference to claims of creditors."

■■ Hence, in addition to holding that payment on the notes would, under the circumstances of this case, be in violation of the Law, the Pennsylvania Courts would also conclude that such payment would be against public policy and hold that § 303 would not bar the Company from raising the statutory prohibition in a suit on the notes.[7]

■ Thus, the petitioners are "creditors who have provable claims liquidated as to amount and not contingent as to liability" against the Company in excess of $500. On March 31, 1961, it became liable on four of the notes bearing that date even though the Law impliedly prohibited it from paying them until such time as its financial condition permitted. Columbian Bank's Estate, supra; Mountain State Steel Foundries, Inc. v. C. I. R., supra; Christie v. Fifth Madison Corp., 123 N.Y.S.2d 795 (Sup.Ct.1953). But compare F. G. Shaw v. Circle Fisheries Co., Inc., 37 Erie L.Jur. 351 (C.P. Erie, Pa., 1954). When the Company persisted for 30 days or more in its refusal to pay after being notified that payment had not been made, the amount of the four remaining notes became owing. See Engelken v. Shanty Shops, Inc., 303 N.Y. 784, 103 N.E.2d 895 (N.Y.Ct.App. 1952). The fact that the payment of a note may be conditional does not mean that the liability for that payment is contingent.[8] No additional act or event, fortuitous or otherwise, need have occurred here before liability on the notes attached.[9]

## II.

■ However, this conclusion does not end the matter. As a defense to the allegations in the petition, the Company has denied in its answer that it committed the second act of bankruptcy concerning preferences. It is the Company's position that the petitioners are in a class subordinate to the creditors listed in the petition, and that at the time of the filing of the petition, the corporation had sufficient assets to satisfy the claims of all creditors of the same class as the allegedly preferred creditors. To constitute a preference under § 60 of the Bankruptcy

---

7. "The doctrine of 'ultra vires' has application only where the subject matter of the contract is foreign to the purposes for which the corporation was created, not to the improper use of a designated or incidental purposes or power." Schwartz v. Mahoning Valley Country Club, 382 Pa. 138, 142–143, 114 A. 2d 78, 80 (1955). In F. G. Shaw v. Circle Fisheries Co., 37 Erie L.Jur. 351, 354 (1954), the Court of Common Pleas of Erie County, Pa., in holding that a violation of § 302(7) of the Law, prohibiting a corporation from purchasing its own stock whenever it would result in reducing the assets of the corporation to an amount which is less than its stated capital is not merely ultra vires but illegal and void, said: "An illegal contract may be defended against and avoided by any of the parties thereto."

8. It has been held that the postponement of the enforcement of a judgment by execution pending appeal does not render the judgment contingent as to liability within the meaning of § 59, sub. b of the Bankruptcy Act. In re Wilson, 16 F.2d 177, 179 (7 Cir. 1926); In re Walton Plywood, 227 F.Supp. 319, 325 (W.D.Wash.1964).

9. "Whether or not a claim is contingent as to liability depends on whether an act or event must occur before liability accrues." 8 C.J.S. Bankruptcy, § 99, p. 781, n. 65.20.

Act, 11 U.S.C.A. § 96, there must be (1) a transfer by a debtor of his property, (2) to or for the benefit of creditors, (3) for or on account of an antecedent debt, (4) made or suffered by such debtor while insolvent, (5) within four months of the filing of the petition, and (6) the effect of which will be to enable such creditor to obtain a greater percentage of his debt than he would be entitled to under the distributive provisions of the Act. 3 Colliers on Bankruptcy (14th ed.) § 60.34. The existence of elements 1, 2, 3 and 5 have been admitted. The trial court, although it gave no figures, found that payment of the notes would have rendered the Company insolvent if it were not already such. We agree that petitioners are in a class subordinate to the general creditors of the Company. Columbian Bank's Estate, supra, 147 Pa. at 440, 23 A. 625, 626, 628; Mountain State Steel Foundries, Inc. v. C. I. R., supra; Robinson v. Wangemann, 75 F.2d 756 (5 Cir. 1935); General Geophysical Co. v. United States, 175 F.Supp. 208 (S. D.Texas, 1959). Yet it does not follow from the existence of these facts alone that a preference has not been committed by the Company. If one or more of the creditors have obtained a greater percentage of their debts than they would have been entitled to under the Bankruptcy Act, and the other elements are present, then a preference has been made and the trial court was in error in dismissing the petition. Swarts v. Fourth National Bank, 117 F. 1 (8 Cir. 1902); 3 Colliers on Bankruptcy (14th ed.) § 60.34. Also see Irving Trust Co. v. Townsend, 65 F.2d 406 (2 Cir. 1933); In re Star Spring Bed Co., 257 F. 176, 180–182 (D.C.N.J.1919), aff'd 265 F. 133 (3 Cir. 1920); Williams v. Bank of

America Nat. Ass'n, 55 F.2d 884 (2 Cir. 1932); In re Silver, 109 F.Supp. 200 (E. D.Ill.), aff'd 204 F.2d 259 (C.A.7, 1953). The district court made no findings regarding this element because under its view of the law there was no necessity for it to do so. On the record before us, we are unable to determine whether or not the second act of bankruptcy had been committed by the Company. Consequently the matter must be sent back to give the district court an opportunity to make that determination.[10]

Accordingly, the judgment of the District Court will be vacated for further proceedings not inconsistent with this opinion.

---

10. Rule 81(a) of the Federal Rules of Civil Procedure provides that these rules do not apply to proceedings in bankruptcy. By virtue of General Order 37 of the Supreme Court, the Federal Rules "shall, in so far as they are not inconsistent with the [Bankruptcy] Act or with these general orders, be followed as nearly as may be." 2 Moore's Fed.Pract. (2nd ed.) ¶ 1.03 [2], Ibid., Vol. 7, ¶ 81.04 [1], Ibid.,

Vol. 5, ¶ 52.03 [3]. Rule 52(a), dealing with findings by the court, is applicable to bankruptcy proceedings. Kelley v. Everglades Drainage Dist., 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); Perry v. Baumann, 122 F.2d 409 (C.A.9, 1941); In re United Wholesalers, Inc., 274 F.2d 316 (C.A.7, 1960); In re Burrows, 7 F.R.Serv. 53e. 12, Case 2 (S.D. N.Y.1943).