**In the Matter of The TRIMBLE COMPANY, a corporation.**

**Appeal of William J. McMINN et al.**

**No. 72–1055.**

United States Court of Appeals, Third Circuit.

Argued Nov. 2, 1972.

Decided March 30, 1973.

**104**

R. J. Cleary, Pittsburgh, Pa., for appellants.

Thomas J. Donnelly, Houston, Houston & Donnelly, Pittsburgh, Pa., for William J. McMinn, appellant.

K. Sidney Neuman, Calvin R. Harvey, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellee.

Edmund K. Trent, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Federal Ins. Co., amicus curiae.

Before FORMAN, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is the second time this case has been here. It originated in an involuntary petition filed by four petitioners in the United States District Court for the Western District of Pennsylvania against the Trimble Company (hereinafter called the Company), incorporated in Pennsylvania in 1942, having its principal office and place of business in Pittsburgh and engaged as a general contractor constructing buildings. The Company answered, pretrial proceedings followed, and after the filing of a stipulation of facts, the matter came to trial on June 3, 1963 before the District Court, a requested jury having been waived. An understanding of the case requires the recital, as sparingly as possible, of its extensive background.[1]

The following circumstances emerge: pursuant to an agreement dated March 12, 1958 and executed April 2, 1958, the Company purchased 8100 shares of its stock from four of its officers: William J. McMinn,[2] Samuel A. Robinson, Joseph J. Warren, Jr., and R. J. Marshall, the petitioners, in consideration of a payment in cash and the issuance of promissory notes to the order of each

---

1. For a more adequate amplification of the genesis of the action, see the opinion of this court In the Matter of the Trimble Company, etc., 339 F.2d 838 (1964).

2. The record suggests the death of Mr. McMinn in 1965, and the substitution of his administratrix in his stead.

petitioner.[3] The stock was surrendered at the closing date, April 7, 1958, as of March 31, 1958. At the time of the transaction, the Company possessed assets of $1,674,971.78 and owed liabilities of $955,094.70. The income of the Company fell progressively from the time of the petitioners' sale of their stock. By March 31, 1961, the date of default on the notes of petitioners, its assets had dwindled to $880,801.91 and its liabilities were $891,845.56.

In July of 1960 Anthony H. Trimble and William F. Trimble advanced to the Company $40,000 and $45,000 respectively, and received therefor the Company's demand judgment promissory notes.

On or about August 1961 the Company ceased all operations except the conservation of its assets. In the pretrial proceedings the Company stated that the Trimbles, the petitioners and the Federal Insurance Company agreed that there should be no distribution to them until the dispute between the Trimbles and the petitioners was settled.[4]

After the first default, petitioners demanded payment of all notes, alleging that the default accelerated payment on the remaining notes. Failure of the Company to satisfy any of the petitioners' indebtedness prompted them to file the involuntary petition, charging a violation of the second act of bankruptcy.[5]

Following the trial, an order was filed in which the District Court recited that the petitioners based their status, as such, on notes in default at a time when payment thereof would have rendered the corporation insolvent. The District Court went on to hold that it is against public policy under Pennsylvania law for a corporation to pay debts arising out of purchase of its own stock, impairing its capital which should be available for its bona fide creditors. It determined that the petitioners' debts were unenforceable at the expense of such creditors, and contingent; whereby petitioners were left without standing to support their petition. The order dismissed the petition without prejudice to the rights of the petitioners to bring, in a court of competent jurisdiction, appropriate proceedings for the liquidation of the Company and a determination of their respective rights against it.

A notice of appeal by the petitioners was filed timely. It was heard before this court and determined in a filed opinion.[6] In it the court first gave consideration to the appellant-petitioners' contention that the District Court erred in dismissing their petition because they are creditors within the meaning of section 59 of the Bankruptcy Act as amended October 7, 1952, 66 Stat. 425. It held that as of April 7, 1958, the Company had the right to purchase its stock, pay cash and issue its notes for the balance of the purchase price. It found that

---

3. Appended hereto is a table listing the vendors and the consideration for the sale of their stock in detail. See Supplementary Stipulation of Facts, App. pp. 18a–29a.

4. Company's Statement of Facts filed August 6, 1962, U.S.D.C.W.D.Pa., No. 62–176.

5. Section 3 of the Bankruptcy Act, 11 U.S.C. § 21, provides:
   "a. Acts of bankruptcy by a person shall consist of his having . . . (2) made or suffered a preferential transfer as defined in subdivision a of section 60 of this Act;"

Subdivision a of section 60 of the Act, 11 U.S.C. § 96, reads:
   "§ 60. Preferred Creditors. a. (1) preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

6. *Supra*, n. 1.

while neither the Pennsylvania statutes [7] nor any authoritative Pennsylvania cases expressly prohibited a corporation from paying for shares of its own stock under circumstances as in the instant case, extended research of cases of other states is persuasive of the conclusion that a Pennsylvania court of statewide jurisdiction would hold that the payment of the notes in issue was unenforceable until such time as the assets of the Company were such that "payment would not violate the law."

Appellants argued alternatively that section 303 of the Pennsylvania Business Corporation Law, 15 P.S. section 2852–303, dealing with the defense of *ultra vires* would bar the Company from asserting the defense of unenforceability in a suit on the notes and that it should also be barred here. As to this the court found that the Pennsylvania courts would conclude that such payment would be against public policy and would hold that section 303 of the Pennsylvania Business Corporation Law, *supra*, would not bar the Company from raising the statutory prohibition in a suit on the notes. Nevertheless it was held that the appellants are creditors who have provable claims against the Company "liquidated as to amount and not contingent as to liability."

The court, however, found that the matter was not yet ended. The Company by way of defense in its answer denied that it had committed the second act of bankruptcy concerning preferences as charged in the petition. It contended that petitioners are in a class subordinate to the creditors who were named in the petition, and that at the time of filing of the petition the Company had sufficient assets to satisfy the claims of creditors of the same class as the allegedly preferred creditors. As to this contention of the Company, this court took the position:

"To constitute a preference under § 60 of the Bankruptcy Act, 11 U.S.C.A. § 96, there must be (1) a transfer by a debtor of his property, (2) to or for the benefit of creditors, (3) for or on account of an antecedent debt, (4) made or suffered by such debtor while insolvent, (5) within four months of the filing of the petition, and (6) the effect of which will be to enable such creditor to obtain a greater percentage of his debt than he would be entitled to under the distributive provisions of the Act. 3 Colliers on Bankruptcy (14th ed.) § 60.34. The existence of elements 1, 2, 3 and 5 have been admitted. The trial court, although it gave no figures, found that payment of the notes would have rendered the Company insolvent if it were not already such. We agree that petitioners are in a class subordinate to the general creditors of the Company. [Cases cited.] Yet it does not follow from the existence of these facts alone that a preference has not been committed by the Company. If one or more of the creditors have obtained a greater percentage of their debts than they would have been entitled to under the Bankruptcy Act, and the other elements are present, then a preference has been made and the trial court was in error in dismissing the petition. [Cases cited.] The district court made no findings regarding this element because under its view of the law there was no necessity for it to do so. On the record before us, we are unable to determine whether or not the second act of bankruptcy had been committed by the Company. Consequently the matter must be sent back to give the district court an opportunity to make that determination. [Footnote omitted.]

"Accordingly, the judgment of the District Court will be vacated for further proceedings not inconsistent with this opinion." In re Trimble Company, *supra* at pp. 844–845.

---

7. Subsections B and F of section 701 of the Pennsylvania Business Corporation Law of 1933 as amended in 1957, P.L. 737–738.

On remand it appears that the Court and counsel conferred informally on August 11, 1965 [8] and the parties agreed to file briefs and suggested findings of fact and conclusions of law embodying the directive of this court in its opinion to make findings regarding the element whether "one or more of the creditors have obtained a greater percentage of their debts than they would have been entitled to under the Bankruptcy Act."

The District Court adopted and filed on October 28, 1971 the findings of fact and conclusions of law [9] proffered by the *amicus curiae*, Federal Insurance Company, a creditor of the Company. Briefly stated, they incorporated in detail fact findings concerning the relationship of the Company and its stockholders; the sale of its stock to appellants; the loans of the Trimble brothers; the indebtedness due to Federal Insurance Company for sums it paid as surety on account of the Company's unperformed obligations; the amount of the assets and the liabilities of the Company as of February 4, 1962 and the filing of the involuntary petition four months thereafter on June 4, 1962.

Specifically, concerning the notes petitioners received for the sale of the stock, the District Court found, among other things:

"8. On March 31, 1961, when the notes securing the third installment of said purchase price were due, the Company had no unrestricted and unreserved earned surplus.

"9. On March 31, 1962, when the notes securing the fourth installment of said purchase price were due, the Company had no unrestricted and unreserved earned surplus.

"10. The Company did not pay the notes securing the third or any subse-

quent installment of said purchase price."

As to the Trimble notes, the Court found:

"11. On July 28, 1960, Anthony H. Trimble and William F. Trimble III paid the Company a total of $85,000, for which the Company gave them its 5½% demand promissory notes.
. . .

"12. Said payments were made as loans to the Company and not as capital contributions."

Among others, the Court came to the following conclusions of law:

"3. The claims of Anthony H. Trimble and William F. Trimble III, in the total amount of $91,623.00 on June 4, 1962, are valid claims and must be taken into account on the same basis as the claims of the other creditors of the Company in determining the amount of the Company's liabilities.

"4. The claims of petitioners totaling $160,771.28 on June 4, 1962 are valid claims, but are not entitled to be paid until all the other creditors of the Company have been paid.

"5. By reason of the subordination of petitioners' claims, the assets of the Company on June 4, 1962 were sufficient to pay the claims of all the other creditors of the Company in full.

"6. The effect of such of the payments made by the Company within four months preceding the filing of the petition on June 4, 1962 as were in payment of antecedent debts of the Company was not to enable the creditors receiving such payments to obtain a greater percentage of their debts than any other creditor of the same class and did not enable such creditors to receive more than they were enti-

8. See In the Matter of The Trimble Company, U.S.D.C.W.D.Pa., No. 62–176, Motion for Order Fixing Time to File Brief on Remand, filed September 3, 1965.

9. App. pp. 87a et seq.

tled to receive under the distributive provisions of the Bankruptcy Act of July 1, 1898 (30 Stat. 562) as amended (11 U.S.C. § 1 ff).

"7. The Company has not committed the second or any other act of bankruptcy.

"8. The petition must be dismissed, with prejudice."

On the same day the Court filed its order dismissing the petition.[10]

The case is again here by reason of appellants' timely appeal from that order. They urge that the District Court erred in making findings of fact and conclusions of law which adjudicated claims and priorities among so-called creditors of the alleged bankrupt without a determination that the Company was bankrupt; in finding as a fact that the payments made by the Trimbles to the Company totaling $85,000, for which they received the Company's 5½% demand judgment promissory notes, were loans and not contributions to the capital of the Company, and the claims of the Trimbles are valid claims and entitled to be taken into account on the same basis as the claims of other creditors of the Company.

The appellants request that relief be granted to them by way of a review by this court of the merits of the Findings of Fact and Conclusions of Law alleged-

ly unnecessary for determination of whether the second act of bankruptcy has been committed; specifically Finding of Fact No. 12 and Conclusions of Law Nos. 3 and 4; that this court should conclude that the Trimble payments were in substance, in fact and in law, contributions to the capital of the Company, and if they are held to be loans to the Company, they should be adjudged junior in priority to the indebtedness to appellants. Alternatively, they plead that in lieu of a determination of the merits of the Findings of Fact and Conclusions of Law this court should direct that they be deleted from the record in this case and order the dismissal of the petition without prejudice to the rights of the appellants to pursue other remedies available to them.

The Company, on the other hand, contends that the District Court properly determined the total amount and classification of the claims against it in support of its findings that the assets of the Company were sufficient to pay the claims of all creditors other than appellants, whose claims were subordinated, and the alleged preferential payments did not enable creditors receiving such to obtain a greater percentage of their debts than any other creditor of the same class or to receive more than they were entitled to recover under the distributive provisions of the Bankruptcy Act; that the District Court properly

---

10. The order reads:
"AND NOW, this 28th day of October, 1971, upon consideration of briefs and proposed findings of fact and conclusions of law submitted by the parties and by Federal Insurance Company as *amicus curiae*, and in accordance with the foregoing findings of fact and conclusions of law, and the Court being of opinion that in accordance with the criteria set forth in the opinion of the Court of Appeals (339 F.2d at 845) no preference was committed, inasmuch as no creditor obtained a greater percentage of payment than such creditor would have been entitled to under the Bankruptcy Act, because the financial position of the company was such that

all creditors would have been entitled to payment in full (except the petitioners, who are subordinate to the general creditors, see 339 F.2d at 845), so that the creditors who were paid 100% of their claims during the four months preceding the filing of the petition did not obtain a greater percentage of their debts than they were entitled to receive, for they were entitled to receive 100%; and the Court therefore being of opinion that since there was no preference under 11 U.S.C. § 96 there was no 'second act of bankruptcy' committed under 11 U.S.C. § 21(a)(2), and the petition should be dismissed,
"IT IS ORDERED, that said petition be and it hereby is, dismissed."

found that the advances totaling $85,000 made on July 28, 1960 by the Trimbles, for which they received the Company's 5½% demand promissory judgment notes, were made as loans to the Company and were entitled to payment on the same basis as other general creditors ahead of the appellants whose claims were allegedly subordinated. The Company urged that no act of bankruptcy having been committed, this court should affirm the findings and conclusions of the District Court and bring the litigation to a conclusion, since the proceedings are now in their tenth year, precluding the Company from paying the claims of its creditors lawfully entitled to be paid.

The immediate problem with which we are confronted is the question, raised by the appellants, of whether the District Court erred in determining the dispute on the merits of the indebtedness to the Trimbles on their demand promissory notes made by the Company as against the indebtedness to the appellants on their unpaid promissory notes. A seemingly anomalous situation results from the fact that in finding that the Trimble payments were loans rather than capital contributions resulting in the subordination of petitioners' notes to them, the District Court has in effect ordered priority among the creditors while dismissing the petition because there was no violation of the second act of bankruptcy.

■ Every court of general jurisdiction has power to determine whether the conditions essential to its exercise exist.[11] Furthermore, even if the court erred in its assumption that it had jurisdiction to pass upon the claims, its judgment would not be void but only in error and therefore, if not challenged on appeal, it would become final and immune from collateral attack. Two leading cases which have so held are Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L. Ed. 104 (1938),[12] and Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940).

In their request for a review of the merits, both parties at least infer that the trial court had subject matter jurisdiction. For their part appellants urge:

"It is the Petitioners' position that this Court should review the merits and pass upon the prejudicial Findings of Fact and Conclusions of Law of the District Court. The record is as complete as it ever will be on these issues. After some *ten* years of litigation in this case, with the prospect of the same issues being returned to this Court on appeal if the petition is dismissed without prejudice, the ends of justice would best be served by this Court's adjudicating the controversy at this point in time. . . .

\* \* \* \* \* \*

"Finally, it should be noted that such procedure is completely within the scope of Section 24(a) of the Bankruptcy Act, 11 U.S.C. 47(a), which gives the Courts of Appeal

---

11. Texas & Pacific Railway Company v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 274, 46 S.Ct. 263, 70 L.Ed. 578 (1925).

12. "When an erroneous judgment, whether from the court of first instance or from the court of final resort, is pleaded in another court or another jurisdiction the question is whether the former judgment is *res judicata*. After a federal court has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of *res judicata* is made has not the power to inquire again into that jurisdictional fact. [Footnote omitted.] We see no reason why a court, in the absence of an allegation of fraud in obtaining the judgment, should examine again the question whether the court [footnote omitted] making the earlier determination on an actual contest over jurisdiction between the parties, did have jurisdiction of the subject matter of the litigation. In this case the order upon the petition to vacate the confirmation settled the contest over jurisdiction." Stoll v. Gottlieb, 305 U.S. 165, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938).

broad discretion, ' * * * to review, affirm, revise or reverse, both in matters of law and in matters of fact * * *'."

In turn, appellees urge affirmance:

"The breadth of the District Court's findings are particularly appropriate since, as the petitioners state, the record before the District Court on the disputed claims is as complete as it ever will be on these issues. While this Court does have broad powers of review under § 24(a) of the Bankruptcy Act, the findings of the District Judge should be deemed presumptively correct and should be sustained by this court unless there is an obvious error of law or some clear mistake of fact. . . . We submit there has been neither and this Court should affirm the findings and conclusions of the District Court."

■ From these excerpts it is apparent that neither party contests the jurisdiction of the court to decide whether the Trimbles are entitled to priority over the claims of the appellants. Notwithstanding absence of attack by the parties on the jurisdiction of the District Court to dispose of the dispute between the Trimbles and the petitioners without an adjudication in bankruptcy raised by the involuntary petition, the responsibility is, as always, on this court itself, to test the presence of jurisdiction before proceeding to determine the merits of the controversy.[13]

Moreover, under the remand of this court, the District Court was specifically required to determine the presence of el-ements four and six of the second act of bankruptcy.[14] Thus the District Court was obliged to examine the Company's books for a record of its assets and liabilities in order to determine element four (insolvency) and the classification of its debts in order to determine element six (preference). For the purpose of determining insolvency the notes of appellants had to be included, for these were subordinate but non-contingent debts, resulting in an excess of liabilities over assets. Thus the insolvency of the Company is conclusive and indeed was undisputed. For the purpose of determining preference, however, the notes of appellants did not have to be included, since they were subordinated to general creditors. The District Court found that on February 4, 1962, the Company had assets of $324,252.29 and liabilities (including the Trimble claims but not the appellants') of $278,632.30; that on June 4, 1962, the assets were $291,856.73 and liabilities, $245,491.14 (App. 90a, 91a). In their involuntary petition filed June 4, 1962, appellants alleged that within four months of its filing, the Company had made preferential payments of $32,241.32. Obviously with a margin of assets over liabilities of $45,619.99 on February 4, 1962, and $46,365.59 on June 4, 1962, there was more than sufficient to pay general creditors and no preference was committed by the Company. Furthermore, the computation would lead to the same result in the determination of preference regardless of whether the Trimbles were considered as creditors or contributors to capital.

The specific objection made by appellants is not that the District Court

---

13. ". . . On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L. Ed. 462 (1884) ; Moore v. Sylvania Electric Products, Inc., 454 F.2d 81 (3d Cir. 1972) ; Kane v. Ford Motor Company, 450 F.2d 315 (3d Cir. 1971) ; Shahmoon Industries, Inc. v. Imperato, 338 F.2d 449 (3d Cir. 1964) ; Williams v. Rogers, 449 F.2d 513 (8th Cir. 1971).

14. See n. 5, *supra*.

lacked power to make this finding, but rather that it failed to exercise judicial restraint in making "extraneous Findings of Fact and Conclusions of Law," which would prejudice the appellants from exercising any further remedies they may have.

The assets were sufficient to pay all the general creditors 100% even counting the Trimbles as such. Of course, it follows that they were sufficient to pay 100% if they were *not* counted as creditors. Yet the District Court arrived at the determination that the Trimble notes were actually loans and not contributions to capital, leaving only a small balance of assets, if any, to apply on the indebtedness of the appellants. This affects the issue of appellate review, for if the District Court had decided a question which was so collateral or incidental to the judgment that it would not be *res judicata*, there would be no need to review it here, as the question could be relitigated. (See 1B J. Moore, Federal Practice ¶0.443[5], at 3919–3921 (2d ed. 1965). For a discussion of a broader application of *res judicata*, see *id.*, at 3925–3928, discussing Florida Central R. Co. v. Schutte, 103 U.S. 118, 26 L.Ed. 327 (1881).) Or if the question which the court decided were immaterial but in practical effect prejudicial, as for example, when a determination is made which is adverse to the winning party, it might only be possible to delete this finding but not to review the merits.[15]

The policy which denies conclusive effect to determinations unfavorable to the winner, because judicial review is not available to him, does not operate with regard to the loser. Appellate review of all grounds supporting the judgment is available at the instance of the losing party. The question is whether the controverted fact is a ground supporting the judgment of dismissal—whether it is an "ultimate and controlling issue,"[16]—since the result, that is, the dismissal of the petition, would have been the same however this fact were decided in face of the absence of proof of a violation of the second act of bankruptcy.

Restatement of Judgments § 68 Questions of Fact, states:

"(1) Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action . . . ."[17]

See also § 68 Comment (c):

"Where a question of fact is put in issue by the pleadings and is submitted to the jury or other trier of facts for its determination, and it is determined, the question of fact is actually litigated, and the judgment is conclusive between the parties in a subsequent action on a different cause of action."

15. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939).

16. Hochman v. Mortgage Finance Corp., 289 Pa. 260, 263, 137 A. 252 (1927).

17. Cited with approval in Girsh v. Girsh, 218 F.Supp. 888 (E.D.Pa., 1963). Girsh quotes at length from Downing v. Halle Bros. Co., 395 Pa. 402, 150 A.2d 719 (1959) for the following exposition of *res judicata*:
"In Wallace's Estate, 316 Pa. 148, 174 A. 397 . . . (1934) it was said: 'Broadly stated, the rule of res judicata is that when a court of competent jurisdiction has determined a litigated cause on its merits, the judgment entered, until reversed, is, forever and under all circumstances, final and conclusive as between the parties to the suit and their privies, in respect to every fact which might properly be considered in reaching a judicial determination of the controversy, and in respect to all points of law there adjudged, as those points relate directly to the cause of action in litigation and affect the fund or other subject-matter then before the court. . . .'" at pp. 409, 410, 150 A.2d at p. 723.

We think the resolution of the Trimbles-appellants dispute was appropriate. In a case such as this, where litigation has dragged on so long and the record is complete, it would seem proper to make comprehensive findings of fact. This should aid in the prompt liquidation of the Company. Although the resolution of the issue of the Trimbles' notes did not pivotally affect the outcome, it is nonetheless essential to the computation since the total due general creditors could not be computed without its determination. It is an essential part of a composite fact. It was also raised by the pleadings and fully litigated by both parties during a two-day trial before the District Court. Therefore it is the determination of an ultimate and controlling issue, and as such would be *res judicata*, leaving the losing party with no option but to lodge an appeal.

■ The District Court had jurisdiction over the parties and the subject matter, and its examination into the facts underlying the dispute between the Trimbles and the appellants as to the standing of their respective notes was justified in order to align assets and liabilities and classify indebtedness so that it could make the required determination whether elements four and six of the second act of bankruptcy were present in this case. The general rule with respect to Findings of Fact under F.R. Civ.P. 52(a) is that they will not be displaced by a reviewing court unless "clearly erroneous." However, as stated in Stevenot v. Norberg, 210 F.2d 615, 619 (9th Cir. 1954):

"When a finding is essentially one dealing with the effect of certain transactions or events, rather than a finding which resolves disputed facts, an appellate court is not bound by the rule [footnote omitted] that findings shall not be set aside, unless clearly erroneous, but is free to draw its own conclusions." [Footnote omitted]

This same concept is expressed in United States v. Anderson, 108 F.2d 475, 479 (7th Cir. 1939) as follows:

" . . . where the ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact, it is subject to judicial review, and on such review the appellate court may substitute its judgment for that of the trial court, Bogardus v. Commissioner, 302 U.S. 34, 39, 58 S.Ct. 61, 82 L.Ed. 32" (1937).

See also Brown v. Commissioner, 180 F. 2d 926 (3d Cir. 1950); Walter v. Atha, 262 F. 75 (3d Cir. 1919).

Actually the sole issue raised on appeal is the characterization of the transaction between the Trimble brothers and the Company. Appellants urge that the payment of $85,000 to the Company represents not a loan but a contribution to capital. They contend that this conclusion arises from a consideration of the circumstances surrounding the transaction, and that to regard this payment as a loan violates the Agreement of 1958 between the Company and the appellants for the purchase of their stock and the rules of fair play.

At the time of the purchase of appellants' stock by the Company, the written agreement, dated March 12, 1958, provided in part:

"3. So long as any of the promissory notes issued pursuant to this agreement remains unpaid the Company will not incur any indebtedness or loans which shall have prior position over the indebtedness evidenced by such notes except for borrowings from banks in the normal conduct or course of the Company's business, and except for borrowings which may be incurred to pay the indebtedness evidenced by such notes."

The agreement is signed "The Trimble Company, By Anthony H. Trimble, Jr., Vice President," and by the four appellants herein, William J. McMinn, Samuel

A. Robinson, Joseph A. Warren, Jr., and R. J. Mitchell. Furthermore, a paragraph follows which states that:

"In consideration of the execution and delivery of the foregoing agreement, the undersigned persons who together are the registered owners of a majority of the outstanding shares of capital stock of The Trimble Company agree to vote their shares of stock in said Company to approve and carry out the terms of the said agreement.

"[Signed] Lois T. Trimble, Mary Duncan Trimble, W. F. Trimble III, Anthony H. Trimble, Individually and as Guardian of the Estates of Mark D. Trimble and W. F. Trimble IV, Minors."

On July 28, 1960, after the purchase of appellants' stock, the holdings of the stockholders [18] of the Company were:

| Name of Shareholder | Number of Shares |
| --- | --- |
| Lois T. Trimble [19] | 1,100 |
| Anthony H. Trimble | 4,800 |
| Anthony H. Trimble, guardian of William F. Trimble IV | 550 |
| Mark D. Trimble | |
| William F. Trimble III | 2,575 |
| Mary Duncan Trimble [19] | 525 |
| William F. Trimble, custodian for John Hoon Trimble | 100 |
| William F. Trimble III, custodian for Mark D. Trimble | 50 |
| TOTAL SHARES | 9,700 |

In Gordon v. Hartford Sterling Co., 350 Pa. 277, 288, 38 A.2d 229, 234 (1944), the Pennsylvania Supreme Court held that where the owner, Avrach, furnished all the capital for the corporation,

"The company was his instrumentality and when he put money into it, he put

money into his own business as its sole owner, not in another's enterprise *by way of a loan.* . . . The learned auditing judge correctly stated that 'The other stockholders were but figureheads. Avrach's control was absolute. The business was in reality his.' Avrach was not a creditor dealing with a debtor corporation; he was lending money to himself. To permit him to share as creditor in the assets of a company, which is merely his creature, would encourage fraud and defeat the valid claims of other creditors." *Cf.* Erie Drug Company Case, 416 Pa. 41, 44, 204 A.2d 256 (1964).

Since the Trimble brothers and their immediate families owned the entire stock of the corporation after the stock purchase of 1958, their control over the business was as absolute as a sole owner, and for the purpose of this analysis they may be so regarded.

The policy of Pennsylvania law is to raise the highest possible standard of morality for the conduct of a sole owner. Law v. Fuller, 217 Pa. 439, 440, 66 A. 754 (1907) embraces the principle that "The only just and practicable doctrine is that the director of a corporation may advance money to it, . . . but always subject to scrutiny and under the obligation of acting in the utmost good faith."

In the old but widely-cited case, Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 590, 23 L.Ed. 328 (1875), it was said:

"So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he be-

---

18. See Schedule 3 annexed to Findings of Fact and Conclusions of Law of the District Court.

19. The record is vague as to the relationships of Mrs. Lois T. Trimble and Mrs.

Mary Duncan Trimble, one of whom is the mother of the Trimble brothers and the other the wife of William Trimble.

comes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness." e. g. Manufacturers Tr. Co. v. Becker, 338 U.S. 304, 311, 70 S.Ct. 127, 94 L.Ed. 107 (1949); Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); DeMet v. Harralson, 399 F. 2d 35, 39 (5 Cir. 1968); Hopper v. American National Bank of Cheyenne, Wyoming, 309 F.2d 244, 247 (10th Cir. 1962).

■ Applying such rigid standards to the present case, it becomes necessary to ascertain whether the note transactions between the Trimble brothers and the Company were accompanied by the fullest disclosure to, and assent of, all concerned.

The minutes of the Company's board of directors disclose the adoption of the following resolution. The minutes are dated July 29, 1960, and are signed by Anthony H. Trimble, Jr., W. F. Trimble, III, vice president, W. W. Lauer, president, and Glenn R. Reed, secretary. Mr. McMinn signed on August 4, 1960.

"RESOLVED that until otherwise ordered by the Board of Directors any two officers of the Company be and they hereby are authorized to borrow money for the account of this Company from William F. Trimble III or Anthony H. Trimble, or both of them, and for that purpose and as evidence thereof to execute and deliver all necessary promissory notes or other obligations of this Company including, but without limitation, judgment notes, payable on demand or otherwise and at a rate of interest not exceeding 6% per annum, and as security for the payment thereof to pledge, assign, mortgage or grant a security interest in any property including, but not limited to, real estate, stocks, bonds or other securities, accounts receivable, chattels, or inventories of the Company, and to execute and deliver all agreements or instruments necessary therefor; PROVIDED, HOWEVER, that neither William F. Trimble III nor Anthony H. Trimble shall as an officer of the Company execute or deliver any instrument creating any indebtedness of the Company hereunder, or securing the payment thereof with respect to any particular borrowing wherein he is the lender.

"FURTHER RESOLVED that any such borrowing or borrowings made, or any such indebtedness, incurred, on or about July 28, 1960, is hereby ratified, approved and confirmed."

At the hearing Mr. Anthony Trimble on cross-examination responded that he and his brother would have made these loans to the corporation even if Mr. McMinn had refused to sign the minutes. According to Mr. McMinn's testimony, the president, Mr. Lauer, asked him to sign a resolution on August 4, 1960 as director of the Company. Mr. McMinn said the explanation Mr. Lauer gave him was, "We want to bid on larger work, to get bigger contracts. And, we want a better looking statement, and the boys are going to put some money in the company." (App. 81a) There was no discussion respecting the fact that the notes were judgment notes or of the impact of the resolution on the Agreement of 1958 with the appellants.[20] Mr.

20. Mr. McMinn further testified:
"Q. . . . Now, did Mr. Lauer explain to you why, if they were as you stated, if the Trimbles were going to put additional funds in the company, why they were taking back judgment notes?
"A. No sir.
"Q. And then, why did you sign these judgment notes?

McMinn did not inform the other three appellants regarding the resolution. Mr. Mitchell testified that he had no knowledge of the resolution at the time. The fact that the Trimbles held judgment notes of the Company does not appear on any of its balance sheets in the record. Thus there was hardly a full disclosure to, and assent by, all concerned with the Trimble transactions.

Appellees point out that the payments to the Company were needed to pay *bona fide* debts, including tax liabilities, payroll, and other bills. But the tax liabilities and perhaps other debts could have become the personal liabilities of the officers of the Company. In any event, the characterization of the advances as loans or as capital contributions does not turn on whether or not the money was used to pay genuine expenses of the Company. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) was a full-blown bankruptcy case. Yet much that was said in it illuminates the path to be followed in the circumstances of the instant case. There the Court stated:

> "And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

> "Though disallowance of such claims will be ordered where they are ficititious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment. At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*." [Footnotes omitted.] At pp. 309–311, 60 S.Ct. at p. 247.[21]

"A. Well, I figured this way. I figured it was the Trimble boy's money and if they wanted to put the money in, let them go ahead.

"Q. Did you at that time have any discussion with Mr. Lauer as respecting these judgment notes and the contract which you then had with the Trimble Company?

"A. No, sir." (App. p. 82a)

21. Partially under the authority of Pepper v. Litton, *supra*, undercapitalization

In the instant case, the corporation was adequately capitalized to begin with, but suffered overwhelming losses during the years 1958 through 1961. In such a situation, a test which may be used to decide whether a contribution by a proprietary interest is a loan or an additional injection of capital is whether the advance was made at a time when a bank or other ordinary commercial agency would be willing to lend it funds.[22] It is patent from the testimony of Mr. A. H. Trimble that the banks were unwilling to extend any further credit at the critical juncture of the Company's affairs.[23]

The Company's losses were listed as follows: 1958, $91,191.15; 1959, $433,398.17; 1960, $317,959.62; 1961, $140,108.48. Whether these were the result of mismanagement or other factors, they occurred after the appellants' stock had been purchased, following a dispute over a change in policy and administration of the Company, and particularly over the appointment of Mr. Lauer as president. During the many years that the four appellants served the Company it prospered, and they, at any rate, had nothing to do with its losses. Some of the funds owed to them have already been dissipated, however, and the Company contends that the balance should be paid to its alter ego, the Trimbles, rather than to satisfy appellants' indebtedness, which the Trimbles had specifically agreed to protect. The motives of the Trimble brothers in continuing to operate their 100-year-old family business were strong personal ones [24] and not necessarily in the best interest of all who were involved in its fortunes.

Not to be lost is the significance of the Trimbles' receipt of judgment demand notes as security for their advances. The same resolution approving them also authorized any two officers of the Company to assign any security interest in any property of the Company as collateral for the payment of the judgment notes. It also should be recalled that the four appellants did not have judgment notes, but only ordinary promissory notes, for their debt from the Company, and no other security. They had nothing to rely on except the

has been used as a basis for subordinating claims of sole owners. In Re Regency, 96 F.Supp. 535 (U.S.D.C.N.J. 1951).

22. N. Lattin, R. Jennings, R. Buxbaum, Corporations, Cases and Materials, 165 (4 Ed. 1968).

23. A. H. Trimble gave the following testimony on direct examination:
"Q. Would you describe briefly how the banks treated you?
"A. We started out with about $300,000.00 we borrowed from Union National Bank. And then I guess these notes were coming due and they got kind of squeamish and they had a man over there in the end and we pledged all our receivables to them.
"Q. Had you and Bill incurred any personal liabilities?
"A. Yes. And then before we pledged our receivables to them, Bill and I were on notes over there to the bank for money.
"Q. By being on the notes, what do you mean?
"A. We were responsible for the company paying the bank back. If the company didn't pay it back, Bill and I were going to pay it.
"Q. Do you recall whether this was before or after you had loaned the total of $85,000.00?
"A. This was before.
"Q. Before?
"A. Yes. We couldn't go to the bank with that $85,000.00. We were afraid to ask them." Transcript p. 125.

24. A. H. Trimble, on cross-examination, testified:
"Q. So that, then the need as you stated for the $85,000.00 being passed to the company at that time might have continued for a certain period of time, and there might have been a requirement on your part to put in further funds, is that correct?
"A. If they were available.
"Q. All based upon the fact that the banks would not loan you any further funds, is that correct?
"A. Yes, sir.
"Q. You were desirous of keeping the company going, were you not?
"A. We had to." (App. 58a).

promise contained in the Agreement, that no other obligation would be incurred which was prior to their indebtedness. The ease of collecting judgment notes, secured by any property available, made possible an automatic priority for the Trimble advances.

Appellees concede that if such security had been granted it would have been contrary to the Agreement of 1958, but they point out that no security was, in fact, granted, and judgment on the notes was never entered against the Company. These facts in themselves do not show the innocence of their intentions. On the contrary, it is the very fact that they virtually held their security from July 28, 1960 in secrecy that implies their bad faith, as in Schooley v. Schooley and Co., Inc., 355 Pa. 507, 511, 50 A. 2d 213 (1947), and as in Pepper v. Litton, *supra*. They were able to set the stage for granting themselves a preference, leaving their contribution in the business as long as possible, but being prepared to take it off if the ship began to sink. *Schooley, supra*, describes a situation in which a note-holding director of a closely-held corporation withheld entry of judgment on the debtor's note for a year after the obligation had been created, waiting until the debtor's insolvency had become apparent, and entering judgment just before a receiver was appointed. This was held to be an unlawful preference.

Section 2 of the Pennsylvania Act of 1901, "Collusion of preferred creditor," (39 P.S. § 152) provides that if a corporation suffers a judgment to be entered against it with a view to giving a preference to a creditor, at a time when it is insolvent or contemplating insolvency, and within four months of the commencement of insolvency proceedings, and that creditor *knows* of these facts, the judgment will inure to the benefit of all the creditors of the insolvent. As pointed out in *Schooley, supra*, such knowledge will be imputed by law to the creditor if he has withheld entry on the judgment and, so to speak, secreted it. Section 2 of the Act (39 P.S. § 153), under the heading "Presumption of knowl-edge and intent of creditor," also provides:

"A presumption of such knowledge and intention shall arise, by reason of the fact of such insolvency, . . . if such judgment . . . shall not have been entered . . . at or about the time of the creation of the debt, or if the transaction shall not have been made in the usual and ordinary course of the business of such insolvent."

In the instant case, the preparation by the Trimbles for protecting their advances to their corporate entity was laid, but the attempt was never carried out. It may be that the bankruptcy proceedings interrupted the attempt. It would be hard for the owner-lenders to argue that they never did intend to carry it out at any time when it would have injured these creditors, since their posture has been at least the equivalent of an attempt to enter judgment on their notes through these proceedings in the bankruptcy court. For the courts themselves to implement such inequity would be unwarranted. To quote Pepper v. Litton again, 308 U.S. at p. 312, 60 S.Ct. at p. 248.

"No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart."

Finally, we turn to a further consideration of the place of the Agreement of March 13, 1958 in this controversy. Clause 3, which prohibits the corporation from incurring any debt which would have priority over the appellants' notes makes explicit the duty of the directors of the corporation toward these former stockholders. Even without such an agreement, they were under a duty as

fiduciaries not to serve their own advantage to the detriment of their *cestuis,* and in this context their former stockholders, now creditors, stood in such a relation toward the sole owners and directors. The former stockholders' only security was the trust they reposed in the owners, but the latter have so managed the affairs of the corporation that when all other creditors are paid there will only be enough to pay off, roughly speaking, their own advances represented by their judgment demand notes.

Clause 5 of the Agreement of March 12, 1958 is also worthy of note. It reads:

"5. The Company hereby represents and warrants that it has and will continue to have corporate power and authority to make and carry out its undertakings and duties under this Agreement and to execute and deliver the notes hereinabove provided for; further, that none of the terms or conditions of this Agreement or of the notes, nor the execution, delivery or performance of its undertakings hereunder, shall or will be in violation of or in conflict with the provisions of any law regulating the Company, its business or affairs or the Company's Articles of Incorporation, by-laws, stock or any agreement, indenture or other instrument, undertaking or obligation to which the Company is a party or in which it is bound; and, further, that all necessary and prerequisite corporate action to authorize the execution, delivery and performance of this Agreement and said notes, as well as the repayment of the indebtedness evidenced by such notes, has been

or will forthwith after the closing hereunder be duly and effectively taken and that this Agreement and said notes when executed on behalf of the Company will constitute the valid, binding and continuing obligations of the Company."

In spite of this warranty of legality, the Company has consistently pleaded a defense of illegality. We are unable to find a basis for this defense of the Company against the appellants' subsisting debt in the present context.

For these reasons the Trimble advances of $40,000 and $45,000 to their hopelessly insolvent corporate structure, although clothed in the garments of judgment demand notes, must be held to be contributions to capital. Hence No. 12 of the Findings of Fact, filed by the District Court on October 28, 1971, will be reversed.[25] Conclusion of Law No. 3, filed therewith, will be vacated.[26] The District Court came to the correct result that no violation of the second act of bankruptcy had occurred, and that the involuntary petition should be dismissed, but its Conclusion of Law No. 8 will be modified by the deletion of the words "with prejudice" and the words "without prejudice" will be substituted therefor.[27] The Order of the United States District Court for the Western District of Pennsylvania, filed October 28, 1971, is affirmed except insofar as it incorporates the language in its recital: "and in accordance with the foregoing findings of fact and conclusions of law." The case is remanded to the District Court for further proceedings consistent with this opinion.

25. Finding of Fact No. 12 reads:
    "Said payments [aggregating $85,000 paid by Anthony H. Trimble and William F. Trimble III to the Company for which they received the Company's judgment demand promissory notes] were made as loans to the Company and not as capital contributions." (App. p. 89a).

26. Conclusion of Law No. 3 reads:
    "The claims of Anthony H. Trimble and William F. Trimble III, in the total amount of $91,623.00 on June 4, 1962, are valid claims and must be taken into account on the same basis as the claims of the other creditors of the Company in determining the amount of the Company's liabilities." (App. p. 92a).

27. Conclusion of Law No. 8 reads:
    "The petition must be dismissed, with prejudice." (App. p. 93a).

APPENDIX

TABLE

| Selling Officer | No. of Shares | Total Consideration | Cash Paid April 7, 1958 | Promissory Notes | With Interest at 5% | Notes Paid | Notes in Default |
|---|---|---|---|---|---|---|---|
| 1. William J. McMinn | 2,200 | $ 117,700.00 | $ 35,310.00 | #1 Due March 31, 1958 | $ 16,478.00 | | |
| | | | | #2 Due March 31, 1959 | 16,478.00 | $ 32,956.00 | |
| | | | | #3 Due March 31, 1960 | 16,478.00* | | |
| | | | | #4 Due March 31, 1961 | 16,478.00* | | |
| | | | | #5 Due March 31, 1962 | 16,478.00* | | $ 49,434.00 |
| 2. Samuel A. Robinson | 2,200 | 117,700.00 | 35,310.00 | #1 Due March 31, 1958 | 16,478.00 | | |
| | | | | #2 Due March 31, 1959 | 16,478.00 | 32,956.00 | |
| | | | | #3 Due March 31, 1960 | 16,478.00* | | |
| | | | | #4 Due March 31, 1961 | 16,478.00* | | |
| | | | | #5 Due March 31, 1962 | 16,478.00* | | 49,434.00 |
| 3. Joseph A. Warren, Jr. | 1,500 | 80,250.00 | 24,075.00 | #1 Due March 31, 1958 | 18,725.00 | | |
| | | | | #2 Due March 31, 1959 | 18,725.00 | 37,450.00 | |
| | | | | #3 Due March 31, 1960 | 18,725.00* | | 18,725.00 |
| 4. R.J. Mitchell | 2,200 | 117,700.00 | 35,310.00 | #1 Due March 31, 1959 | 27,463.33 | | |
| | | | | #2 Due March 31, 1960 | 27,463.33 | 54,926.66 | |
| | | | | #3 Due March 31, 1961 | 27,463.34* | | 27,463.34 |
| | 8,100 | $ 433,350.00 | $ 130,005.00 | | | $ 158,288.66 | $ 145,056.34 |

Reconciliation

| | |
|---|---|
| Cash Paid | $ 130,005.00 |
| Notes Paid | 158,288.66 |
| Notes in Default | 145,056.34 |
| Total Consideration | $ 433,350.00 |

* Defaulted