**Stephen B. RAVIN, Interim Trustee, of the estate of Harvey Goldberg, Debtor (Chap. 7), Plaintiff,**

v.

**NEW JERSEY BANK, N.A., Sands Hotel, Inc., and Summa Corporation, Inc., Defendants.**

No. Civ. 82–1187.

United States District Court, D. New Jersey.

July 6, 1983.

Jeffer, Hopkinson & Vogel by Patrick X. Amoresano, Hawthorne, N.J., for plaintiff.

Allan A. Maki by Charles J. Simoldoni, West Paterson, N.J., for N.J. Bank.

Horn, Kaplan, Goldberg & Gorny by Thomas C. Bonner, Atlantic City, N.J., for Sands Hotel.

Crummy, Del Deo, Dolan & Purcell by Paul R. De Filippo, Newark, N.J., for Summa Corp.

## OPINION

BIUNNO, Senior District Judge.

The issues before the court came into being as the consequence of the individual bankruptcy of Harvey Goldberg for whose estate plaintiff was appointed interim trustee. Plaintiff filed a complaint in the Bankruptcy Court as purported to be granted jurisdiction by the Bankruptcy Act of 1978, 92 Stat. 2549, and in particular by § 241(a) of that Act, which appears as 28 U.S.C. § 1471, as amended to be finally effective on April 1, 1984 after a transition period.

The debtor, by implication, was an attorney during the period involved in the complaint, and the claims are evidently based on his alleged misapplication of the funds belonging to clients on deposit in his attorney's "trust account".

One group of alleged misapplications evidently involves checks drawn on the trust account to pay his losses at gambling in the Sands casino in Las Vegas, Nevada, and for this group the claim is made against Sands, its parent Summa, and the Bank. Another group of misapplications evidently involves checks drawn to satisfy obligations owed by him to the Bank, possibly apart from gambling losses in a direct sense. This description is intentionally general, involves no ruling on the merits, and is provided merely to help understand the issues.

A bankruptcy trustee's claims against third persons for allegedly receiving and being chargeable or accountable for clients' funds said to have been misapplied are fundamentally state law claims. No doubt the affected clients, through some suitable vehicle, would be entitled to search for and reach out to trace and locate their misapplied funds in the hands of anyone legally or equitably accountable for their return. Certainly, if the affected clients were repaid by the Trustees of the Clients' Security Fund, N.J. Court Rule R. 1:28, the trustees could similarly seek to reimburse the Fund by way of subrogation or otherwise, see N.J. Court Rule 1:28–5(b).

The accounts of such peculations are all too familiar. Hardly a weekly issue of the N.J. Law Journal, or of the advance sheets for N.J. Reports, arrives in the mails without one or more disciplinary matters reported, far more often than not involving the misuse of clients' funds. While the incidence may be more frequent, its nature and substance are not, as evidenced by what was said some 99 years ago in *Flagg v. Baldwin*, 38 N.J.Eq. 219 (E. & A., 1884):

But our law against gaming goes further than to merely prohibit the vice or avoid contracts tainted with it. It declares it unlawful, and so puts the contracts beyond the protection of the laws or the right of appeal to the courts. The reason and object of the law are obvious. The vice aimed at is not only injurious to the person who games, but wastes his property, to the injury of those dependent on him, or who are to succeed to him. It has its more public aspect, *for if it be announced that a trustee has been false to his trust,* or a public officer has embezzled public funds, *by common consent the first inquiry is whether the defaulter has been wasting his property in gambling.* (Emphasis added) 38 N.J.Eq. at 226–227.

In any event, this general description and broad analysis makes clear that the claims made are of that class coming within § 23 of the former Bankruptcy Act, 11 U.S.C. § 46, as "adverse claims" to be decided by Article III judges, as that section was amended by the 1938 Chandler Act, 52 Stat. 840, which generally revised the Bankruptcy Act of 1898, see *Williams v. Austrian,* 331 U.S. 642, 67 S.Ct. 1443, 91 L.Ed. 1718 (1947) at 644, 67 S.Ct. at 1443, footnote 1.

It was because of the amendment to 28 U.S.C. § 1471, and especially subsection (d) thereof purporting to place exclusive jurisdiction in the newly constituted bankruptcy courts not conducted or presided over by an Article III judge, that the holding in *Northern Pipeline v. Marathon Pipeline,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) was reached.

Nothing in the several opinions in that case remotely suggests that the Congress cannot place exclusive jurisdiction of cases or proceedings "arising under" the Bankruptcy Act, or "arising in or related to" cases under the Bankruptcy Act, in a single federal court. Surely the explicit authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States", *U.S. Const.* Art. I, sec. 8, cl. 4, is sufficient authority to that end. Even in the absence of a bankruptcy, the vesting of the judicial power to extend to all cases, in law and equity, arising "under the Laws of the United States", and to "controversies between Citizens of different States", *U.S. Const.,* Art. III, sec. 2, is sufficient to support the jurisdiction of the district courts over civil actions of interpleader, or in the nature of interpleader, 28 U.S.C. § 1335, and to authorize service of process in personam in every district where a claimant resides or may be found, 28 U.S.C. § 2361.

Since there was no majority opinion, the holding in *Northern Pipeline* may amount to no more than is common to the opinions of the plurality (4 members) and concurring (2 members) justices. The concurrence in the judgment, which affirmed the District Court's dismissal of Northern Pipeline's complaint against Marathon, was grounded on the view that

"so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit over Marathon's objection [is] violative of Art. III of the United States Constitution"

and that

"this grant of authority is not readily severable from the remaining grant of authority to Bankruptcy Courts"

see, 458 U.S. 50 at 91, 102 S.Ct. 2858 at 2882, 73 L.Ed. at 628.

The concurring Justices declined to go beyond that point, noting that Northern's claim was one seeking damages for breach of contract, misrepresentation, and other counts "which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789" and was before the Bankruptcy Court only because Northern had filed its petition for reorganization there.

The ruling in *Northern Pipeline* was not only expressly made prospective only, but the court's judgment was stayed, first until October 4, 1982 and by extension to December 24, 1982, to give Congress time to take action. No action was taken by the extended date, or since.

Meanwhile, the judges in this District promulgated General Rule 47 on October 1, 1982, to take effect on the expiration of the Supreme Court's stay, and to remain in force until Congress takes action or until March 31, 1984, whichever first occurs. The case has been sought to be presented here because of disagreement or uncertainty about the validity of the emergency General Rule 47, the design of which is to establish procedures for a general reference in bankruptcy matters in such fashion that matters constitutionally required to be decided by Article III judges will be so processed, thus satisfying the broadest possible effect of the plurality opinion alone, while retaining the efficiency and usefulness of the specialized expertise of the bankruptcy judges who act by referral only on Article III matters.

█ The issue there sought to be presented cannot be decided in this case for the elemental reason that there was no order, one way or another, by the bankruptcy judge. A brief review of the history is then in order.

An involuntary petition in bankruptcy under Chapter 7 (straight bankruptcy) was filed in September, 1980 naming Harvey Goldberg as the debtor and the interim trustee was named. See Tr. 5/23/83, p. 2, line 20 to p. 3, line 15. This was after the October 1, 1979 effective date of the Bankruptcy Act of 1978, Pub.L. 95–598, 92 Stat. 2549.

The debtor was a New Jersey lawyer temporarily suspended from the practice of law pending final disposition of disciplinary ethics complaints against him by order dated August 18, 1980, issued by Hon. Mark A. Sullivan, Presiding Justice, at Trenton and officially published in the N.J. Law Journal, see Exh. C–1, 5/23/83. Among other things, the Division of Ethics & Professional Services was directed to obtain and secure his files under N.J. Court Rule R. 1:20–5(b), and Richard Roth, Esq., was to receive all funds of Goldberg's in any New Jersey banking institution including three specified accounts (one of which is designated a trust account) in New Jersey Bank, N.A. The records of this court show an order of temporary suspension on February 9, 1981.

Goldberg was evidently indicted in Superior Court, Passaic County, on Indictment No. 873–81 and convicted on charges relating to the misuse of client funds, and a press report of June 3, 1983 indicates that the conviction was affirmed by the Superior Court, Appellate Division, No. A–3788–81.

The interim trustee's complaint was filed September 23, 1982, naming New Jersey Bank and Sands Hotel in Count 1, and the bank alone in Count 2, grounded on alleged violations of the Uniform Commercial Code and the Uniform Fiduciaries Law. There was also a jury demand.

On November 9, 1982 an amended complaint was filed, naming Summa Corporation as an added defendant on Count 1. Neither the original nor the amended complaint alleges any jurisdictional facts.

On November 16, 1982, New Jersey Bank, N.A. filed answer with crossclaims against both Sands Hotel and Summa. There are no separate defenses and no objections of any kind.

On November 17, 1982, Sands filed a notice of motion based on alleged lack of subject-matter jurisdiction.

All events up to this point took place before the Supreme Court's judgment of affirmance took effect prospectively on December 24, 1982.

On December 28, 1982, after emergency Rule 47 had automatically taken effect, the trustee filed a letter brief in opposition to the Sands motion.

On December 30, 1982, Summa filed a notice of motion also grounded on lack of subject-matter jurisdiction.

Nearly 3 months later, with the record disclosing no hearing on the merits and no order on the merits, two orders were entered by consent, on March 21, 1983 on the Sands motion and on March 23, 1983 on the Summa motion, both providing that the motion to dismiss "shall be raised before the District Court in the first instance", and pending determination here staying all proceedings in the matter. All parties, including New Jersey Bank, N.A., which had filed answer and crossclaims without raising any separate defenses or objections, consented to the form and entry of the order.

It is fundamental that every court has the judicial power, that is the jurisdiction, to hear and decide the question whether it has jurisdiction to hear and decide the merits of the matter before it. See *In re Labor Board,* 304 U.S. 486, at 494, 58 S.Ct. 1001, at 1005, 82 L.Ed. 1482 (1937). An unusual set of facts was involved on this point in *Payne v. Griffin,* 51 F.Supp. 588 (D–Ga., 1943). State law decisions to the same effect are found at 20 Am Jur 2d "Courts", § 92 and 21 C.J.S. "Courts", § 113. Wright, Miller & Cooper, in § 3536, define the term "jurisdiction to determine jurisdiction" as the power of a court to determine whether it has jurisdiction over the parties to and the subject matter of a suit, although the bulk of the discussion is concerned with the availability of later collateral attack rather than with direct review. *In the Matter of the Trimble Co.,* 479 F.2d 103 (CA–3, 1973) is one of the decisions cited in that regard.

Plainly, then, the bankruptcy judge made no decision on the motions which, since they were directed to the jurisdiction of the Bankruptcy Court rather than to the merits, there was jurisdiction to decide under the principle just referred to. There is accordingly nothing before this court for decision.

In *Northern Pipeline,* a like motion was heard and decided by the bankruptcy judge, who denied it. The order denying was appealed to the District Court which ruled that there was no subject-matter jurisdiction. It was that decision that was af-

firmed by the Supreme Court on direct appeal.

Similarly, in *United Grocers Corp.,* 30 B.R. 46 (D.C.N.J., 1983), the creditors committee of the debtor in reorganization filed suit in the bankruptcy court against adverse third parties, who moved to dismiss for lack of subject-matter jurisdiction. The bankruptcy court heard, decided and granted the motion on the ground of *Northern Pipeline* and because it concluded that the District Court had no jurisdiction over bankruptcy matters and, even if it did, it lacked authority to refer those matters to the bankruptcy court via General Rule 47, discussed above.

On direct review, Chief Judge Fisher reversed and remanded, relying on *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190 (CA–3, 1983) and other decisions elsewhere. See, also, *White Motor Corp. v. Citibank,* 704 F.2d 254 (CA–6, 1983).

In consequence, since there was no ruling in the bankruptcy court on the question argued in this case, there is nothing for this court to decide and the motions can only be dismissed as not properly before this court.

■ While General Rule 47–B(2) authorizes withdrawal of a reference by this court, the invitation to do so in this case (advanced during oral argument) is declined as not likely to serve any useful purpose. This is because the crucial question may turn out to be whether misapplied trust funds held for clients, if traceable to and recoverable from third parties at all, would be any part of the bankrupt's estate. In principle, such funds would appear to belong to the client cestuis only, and not to creditors of the bankrupt as such, even though the clients may themselves be general creditors having an interest in general, non-trust assets if any there be, to the extent their own trust funds cannot be traced down and recovered. Suits of that nature brought by a substituted or successor trustee appointed under the broad constitutional power of the Supreme Court of New Jersey to deal with matters of attorney discipline (including the Client Security

Fund) or by the Superior Court in the exercise, as successor to the former Court of Chancery, of jurisdiction over trusts, may not be suits at common law at all, but may be suits in equity to establish constructive or resulting trusts, and so not within the Seventh Amendment if brought in a federal court. See *Kennedy v. Lasko Co.*, 414 F.2d 1249, at 1251 (CA–3, 1969); *In re Japanese Electronic Products, etc.*, 631 F.2d 1069 (CA–3, 1980); *Berman v. Automobile Ins. Co., etc.*, 2 F.R.D. 94 (D–N.J., 1941). And compare *Amer. Life Ins. Co. v. Stewart*, 300 U.S. 203, 57 S.Ct. 377, 81 L.Ed. 605 (1937) with *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and later cases in the line, such as *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), a case out of this circuit. Also of interest is *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) in respect to summary jurisdiction in bankruptcy cases under the 1898 Act as amended.